747 A.2d 752

William Sylvester DOUGLAS

v.

STATE of Maryland.

No. 6930, Sept. Term, 1998.

Court of Special Appeals of Maryland.

March 7, 2000.

Margaret L. Lanier, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Walter B. Dorsey, State's Attorney for St. Mary's County, Leonardtown, on the brief), for appellee.

Argued before HOLLANDER, EYLER and THIEME, JJ.

EYLER, Judge.

William Sylvester Douglas, appellant, was convicted by a jury in the Circuit Court for St. Mary's County of second degree assault.[1] The circuit court sentenced appellant to a ten-year term of incarceration, suspending all but five years, and in addition, imposed a five-year term of supervised probation. Appellant presents three questions on appeal:

I. Must the commitment record be corrected to reflect the sentence of the trial court?

II. Did the trial court impose an illegal condition of probation?

III. Did the trial court impose an excessive sentence?

We agree that the commitment record must be corrected to reflect the sentence imposed by the circuit court. In all other respects, we affirm the judgment of the Circuit Court.

### FACTS

Ms. Fox testified that on June 24, 1998, she lived alone at 21706 Coral Place, and that she had lived there for approximately one month. She stated that she and appellant had a romantic relationship which lasted six or seven months. According to Ms. Fox, the relationship ended three weeks prior to June 24, 1998, the date of the relevant events. Ms. Fox stated that on June 24, 1998, she was six months pregnant.

Ms. Fox testified to the following: On June 24, 1998, her mother, sister, and "a young fellow" visited her at the Coral Place house. She was wearing a nightgown, with nothing underneath. The visitors left at approximately 10:20 that night. When they left, she went outside to see them off. When she returned to the house, she saw appellant behind

[1]. The trial court granted appellant's motion for judgment of acquittal on a charge of first degree burglary and first degree rape. The jury found appellant not guilty of second degree rape.

her. Appellant asked if he could come in, but Ms. Fox told him no, because he was intoxicated.

Ms. Fox further testified:

He yanked the door from me and the next thing I know he had pushed me and I had fell onto the floor and I hit my back, I hit my head. I got up and then he pushed me onto the couch. I had food on the couch. And then he came up to me and he said, "after all I did for you, you mean to tell me I can't stay here?" And he hit me with a closed fist in my left eye, and my glasses embedded in my eye, and then my first reaction was to grab him by his shoulder and to ask him to sit down beside me and to talk to me and tell me what was wrong.

Ms. Fox stated that appellant sat beside her and "jumped back up and he looked at [her] in [her] face" and said, "[W]ell, I have already done this. I might as well finish you off." She stated that appellant began walking around in circles, holding his head, and that his eyes were "doing funny stuff." According to Ms. Fox, appellant then told her that she could call the police, and that he was not going to do anything to her. She stated that she told him that she was not going to call the police. According to Ms. Fox, appellant then told her he wanted to go to bed, and she told him that she did not want to go to bed. According to Ms. Fox, "[H]e got in my face and started flinching at me like he was going to hit me again."

Ms. Fox got up to go to the bathroom. Appellant then said to her, "[W]here are you going? You are going to call the police and you called the police on me the last two times. If I go to jail this time I am going to have something to go to jail for." Ms. Fox went to the bathroom and closed the door. Appellant kicked in the bathroom door. When Ms. Fox left the bathroom, she walked toward the living room, but appellant blocked her by "using his chest to push up against [her] chest." Appellant then asked her again if she was going to call the police, and she again told him that she was not. Ms. Fox then went into the bedroom. At that point, according to Ms. Fox,

he said if he was in his right mind, he put his finger up to my head, I ought to blow your mother F-ing head off right now. He talked about he knew where some buddies of his from D.C. that [sic] could finish me off.

Ms. Fox testified that she was "fearful."

Appellant again asked Ms. Fox to go to bed with him and she refused. According to Ms. Fox, appellant told her "if I was his brother's girlfriend, I would be dead right now. He would kill me."

Appellant again asked Ms. Fox to have sex with him, and she again refused. Appellant said, "[Y]ou don't want me to get stupid around here." He "started walking around in circles again, holding his head." He asked Ms. Fox again to have sex and again she refused. According to Ms. Fox, appellant "took his knee and I [sic] put it up against my chest and he pressed me down on the bed and he had his hands pressed down on my shoulders." Ms. Fox told him to get off her because she could not breathe. Appellant got up and began to laugh at Ms. Fox. He "kept talking about some guns he knew about."

According to Ms. Fox, appellant asked her to have sex a couple more times, and she refused each time. She testified that appellant then raped her.[2] Ms. Fox further testified that, after the rape, appellant told Ms. Fox to stay on the bed near the wall. She stated that he lay down next to her, and both went to sleep.

The next morning, Ms. Fox drove appellant to work. Ms. Fox then went to her grandmother's house and told her family about the assault, but not the rape. Ms. Fox's aunt encouraged her to call the police. Ms. Fox called the sheriff's department, and a male deputy came to her grandmother's house. She told him about the assault, but not the rape. After speaking to the deputy, she went to the District Court Commissioner and told her about both the assault and the rape. She told her aunt about the rape after she had told the

---

**2.** As noted, the jury found appellant not guilty of rape.

Commissioner. After she told her aunt, she again spoke to the deputy and told him about the rape. Ms. Fox stated that she had not told the deputy about the rape at first because she was embarrassed, and because she was afraid of appellant.

On cross-examination Ms. Fox stated that appellant had initially lived with her at the Coral Place address and that both his name and her name were on the lease. She stated that she had taken his name off the lease, but she did not specify when she had done so. Ms. Fox further testified that the rape occurred 30 to 45 minutes after appellant had pressed her against the bed.

Appellant's version of the incident was different from Ms. Fox's. According to appellant, on June 24, 1998, he was living with Ms. Fox at the Coral Place address. He was in and out of the house that day because he had been laid off. Appellant stated that there was no one other than Ms. Fox at the house that day.

Appellant testified to the following: At one point in the evening, he went to his mother's house, then returned a little while later. Shortly afterward, he decided to go outside. He and Ms. Fox argued because she thought that he was going to see another woman. He wanted to leave to end the argument, but Ms. Fox would not let him. Ms. Fox was standing in front of the door, and "kept smacking" him on the head. Appellant testified that he "just reacted" and that he hit her in the right eye with his open fist. He stated that he had not meant to hurt her.

According to appellant, after he hit Ms. Fox, they both sat on the couch and he apologized to her. Appellant stated that, after that, they went to bed. Appellant stated that they had had consensual sex on the morning of June 24th but that they did not have sex when they went to bed that night. According to appellant, the next morning, Ms. Fox drove him to work.[3]

---

**3.** Appellant explained that he had been laid off but had one more day to work.

## DISCUSSION

### I.

■ Appellant's first contention is that the record must be corrected to reflect the sentence imposed by the circuit court. We agree.

At the sentencing hearing, counsel told the circuit court that appellant had been incarcerated since July 3, 1998. In addition, the docket entry for February 16, 1999, the date of sentencing, states that appellant's sentence is to begin on July 3, 1998.[4] The circuit court ordered that appellant's sentence begin on that date. However, the commitment record states that appellant's sentence is to run "[c]oncurrent w/any other outstanding or unserved sentence and begin on July 23, 1998."

■ When there is a conflict between the transcript and the commitment record, unless it is shown that the transcript is in error, the transcript prevails. *See Dedo v. State*, 105 Md.App. 438, 461, 660 A.2d 959 (1995), *rev'd on other grounds*, 343 Md. 2, 680 A.2d 464 (1996). In the present case, the transcript and the docket entry both reflect the date of July 3, 1998 as the starting date for appellant's sentence. The commitment record should be amended to reflect the starting date of July 3, 1998.

### II.

Appellant's next contention is that the circuit court imposed an illegal condition of probation. The court sentenced appellant to a term of ten years' incarceration, with all but five years suspended. The court also placed appellant on supervised probation for a term of five years after his release from incarceration and ordered, as a condition of that probation, that appellant have no contact with Ms. Fox. Appellant signed a probation agreement, which stated that he understood the terms of his probation and that he agreed to them.

---

4. In fact, the return on the arrest warrant located with the District Court papers recites that appellant was arrested on July 3, 1998.

Ms. Fox testified that she was six months pregnant on June 24, 1998. At the sentencing hearing, the circuit court noted that Ms. Fox had delivered the child.

Appellant now contends that the condition of probation is improper for two reasons. First, he contends that "contact" is vague. Second, he contends that the "no contact" provision impacts upon custody and visitation of his child and that it was beyond the jurisdiction of the court to order a condition of probation that would interfere with the parent-child relationship.[5]

A sentencing court may "suspend the imposition or execution of sentence and place the defendant on probation upon such terms and conditions as the court deems proper." Maryland Code (1996 Repl.Vol.), Article 27, § 641A(a). This authority, however, is not unlimited. *Sheppard v. State,* 344 Md. 143, 148, 685 A.2d 1176 (1996); *Watson v. State,* 17 Md.App. 263, 301 A.2d 26 (1973). The conditions of probation must be reasonable and have a rational basis. *Id.* at 274, 301 A.2d 26. The conditions must be clear, definite and capable of being properly comprehended and understood not only by the individual upon whom they are imposed but by those responsible for their enforcement. *Id.* A condition of probation may be expressed in general terms "so long as it is contemplated that the court or its designee (usually the probation authority) will provide the probationer with reasonable, specific direction within the ambit of the initially expressed general condition, and such guidance is in fact given." *Hudgins v. State,* 292 Md. 342, 348, 438 A.2d 928 (1982).

Appellant does not contend that the "no contact" condition does not have a rational basis, but rather, that it is too vague. We disagree. As the State points out, "no contact" means "no contact," in person, by telephone, or by mail.

Courts of other jurisdictions which have considered similar conditions have found no ambiguity involved. *See, e.g., State*

---

**5.** The State does not contest that appellant is the father of Ms. Fox's child.

*v. Riles,* 135 Wash.2d 326, 957 P.2d 655 (1998)("no contact" order as a condition of probation is not vague because there is more than one dictionary meaning for the word); *Nitz v. State,* 745 P.2d 1379 (Alaska App.1987)(A common sense reading of the probationary conditions, including that appellant have "no contact with minor girls under the age of 18 unless a responsible adult is present" is "sufficient to provide [the defendant] with fair notice of what conduct is prohibited").

In addition, appellant signed a probation order acknowledging that he understood the conditions of his probation. Further, as the State notes, appellant may, pursuant to Maryland Rule 4–346(b), request a clarification of the probationary condition.

Appellant also complains that the "no contact" provision will prevent him from having visitation with his child. He contends, citing *Smith v. State,* 80 Md.App. 371, 563 A.2d 1129 (1989), that the "no contact" order of the circuit court is untenable and fundamentally unfair because it deprives him of a right to visit his child.

In *Smith,* the trial court attempted to determine the best interest of Smith's children, despite the fact that the custody of the children was a matter within the jurisdiction of the juvenile court. In the present case, the circuit court made no determination relating to the best interest of the child. The court's decision was based on an appropriate condition regulating appellant's relationship with Ms. Fox. In addition, the *Smith* Court noted that the children in that case had been adjudged Children in Need of Assistance, thereby vesting exclusive jurisdiction over the children with the juvenile court. *Smith v. State,* 80 Md.App. at 374, n. 1, 563 A.2d 1129. The Court also noted that "[c]riminal courts may order supervised visitation or otherwise limit contact between parent and child when the juvenile or equity court has not assumed jurisdiction." *Id.* at 376, n. 4, 563 A.2d 1129.

The "no contact" provision is not rendered illegal simply because appellant may need an intermediary to effect visitation with the child. *See Russ v. State,* 519 So.2d 715

(Fla.App.1988)(trial court could impose special condition of probation prohibiting defendant from having any contact with nine year old victim, who was the daughter of appellant's girlfriend, or any member of victim's family, even though defendant's six-year-old daughter was a member of the victim's household).

The State further contends that the condition is valid because appellant agreed to it. In *Sheppard,* 344 Md. at 153–54, 685 A.2d 1176, the Court of Appeals declined to decide whether an otherwise invalid condition of probation "could be valid if freely and voluntarily consented to" by the probationer because Sheppard had not consented. Because we hold that the conditions of probation imposed upon appellant in the present case were valid, we need not decide whether appellant's consent would serve to validate an otherwise unlawful condition.

### III.

Appellant's third contention is that the circuit court abused its discretion in imposing a sentence of ten years, with all but five years suspended.

The guidelines in the present case were 5 to 12 years. The guidelines worksheet indicates a "major" "prior adult criminal record."

In imposing sentence, the circuit court stated:

Very well, Mr. Douglas, the Court does recall the case and even though the evidence was a little skimpy, other than there was a casual mentioning of the fact that the victim was pregnant, there wasn't any official—which would have really made the—made the incident that much more offensive. It was offensive enough because there is no question that the Court found that you had committed the—committed the act. They did not find first degree rape, but they did find second degree assault, which is a very serious offense for which, of course, you can receive—could receive a ten year sentence. The Court is satisfied that the incident and the manner in which the jury found you guilty, there

[were] ample facts to support that. Now, as I say, there was mention of the fact that she was pregnant and are comments concerning the status of the child. So, it wasn't contradicted, so I am going to assume that she was pregnant at the time, and apparently she had the child, I guess, without any complications, otherwise that would have been brought to the Court's attention. But you have seven offender score points against you. [Defense counsel] is correct, the major portion of your problems have not been the assaultive personal contacts with people, but it is serious enough and the Court feels under the circumstances that the bottom of the guidelines is an appropriate sentence.

 Appellant contends that the court relied on an impermissible consideration, that appellant's brother had murdered his girlfriend, in imposing sentence. The State counters that the contention is not preserved because appellant did not raise the issue at sentencing, and in any event, the contention is without merit.

It is unclear whether an objection to the trial judge's consideration of an impermissible factor is waived if the objection is not made at the time of sentencing. *Compare Saenz v. State*, 95 Md.App. 238, 241 n. 1, 620 A.2d 401 (1993) (noting that it was "doubtful" that appellant's challenge to the court's sentence, based in part on his lack of remorse, was preserved for appeal) with *Passamichali v. State*, 81 Md.App. 731, 744 n. 4, 569 A.2d 733, *cert. denied*, 319 Md. 484, 573 A.2d 808 (1990)(noting that a sentence based on improper considerations should be reviewable even if there were no objection because "when it occurs it is too late to object.") Giving appellant the benefit of the doubt, we nonetheless find no merit in his contention that the circuit court based its sentence on the fact that appellant's brother murdered his girlfriend.

 It is well established in Maryland that a trial judge is "vested with virtually boundless discretion" in determining a sentence. *State v. Dopkowski*, 325 Md. 671, 679, 602 A.2d 1185 (1992) (quoting *Logan v. State*, 289 Md. 460, 480, 425 A.2d 632 (1981)). A trial judge may impose any sentence not

in violation of constitutional requirements or statutory limits, so long as it is not motivated by ill-will, prejudice or other impermissible considerations. *Dopkowski,* 325 Md. at 680, 602 A.2d 1185.

A defendant's sentence should be individualized "to fit 'the offender and not merely the crime.'" *Smith v. State,* 308 Md. 162, 167, 517 A.2d 1081 (1986)(quoting *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)). Consequently, a defendant's sentence "should be premised upon both the facts and circumstances of the crime itself and the background of the individual convicted of committing the crime." *Dopkowski,* 325 Md. at 679, 602 A.2d 1185.

Appellant's sentence is within the guidelines in this case and within the statutory limits for second degree assault. The circuit court clearly considered the nature of the offense, including the fact that Ms. Fox was pregnant at the time of the incident. Appellant characterizes the incident as "a blow to the eye." Ms. Fox testified, however, that the incident was not simply "a blow to the eye," but a prolonged incident that included several threats to kill her.

It is also clear that the most important factor the trial court used in fashioning appellant's sentence was appellant's prior criminal record. This was an entirely proper consideration. *Smith,* 308 Md. at 169, 517 A.2d 1081; *Bartholomey v. State,* 267 Md. 175, 193, 297 A.2d 696 (1972). We see nothing to suggest that the trial court considered anything done by appellant's brother in determining appellant's sentence.

**JUDGMENT AFFIRMED. THE CIRCUIT COURT FOR ST. MARY'S COUNTY IS DIRECTED TO AMEND THE COMMITMENT RECORD IN ACCORDANCE WITH THIS OPINION.**

**COSTS TO BE PAID TWO-THIRDS BY APPELLANT AND ONE THIRD BY ST. MARY'S COUNTY.**