**STATE of Vermont v. Martin M. DANAHER**

[819 A.2d 691]

No. 01-469

¶ 1 November 20, 2002. Defendant Martin M. Danaher appeals the trial court's finding that he violated the "no contact" condition of his probation. On appeal, defendant argues that the court erred in concluding that he violated the "no contact" probation condition by being in physical proximity to the victim and that he was not provided fair notice that such actions constituted "contact." We affirm.

¶ 2 On October 11, 2000, defendant was charged with one felony count of lewd and lascivious conduct with a child, G.D., and two counts of prohibited acts with the same victim. On January 31, 2001, pursuant to a plea agreement, he pled no contest to the charge of lewd and lascivious conduct and to one count of prohibited acts. In exchange for his plea, defendant was placed on probation and

received a deferred sentence. Both the probation and the deferred sentence included the condition that defendant have "[n]o contact with G.D. or her family without their prior consent and prior approval of the P[robation] O[fficer]." Further, defendant was required to reside outside of his home and not have overnight visits there until his probation officer and sex offender counselor approved. Defendant could, however, be at his home during the day, but if his children were present, his wife was to supervise.

¶ 3 Defendant's probation officer testified that on February 28, 2001, she met with defendant to review his conditions of probation and explain what was expected of him. She also testified that while discussing the terms of the "no contact" provision they discussed the fact that defendant lived up the hill from a residence frequented by G.D. The probation officer testified that she told defendant "he's not to have any contact with [G.D.]. That he shouldn't be down there when [G.D.] is down there."

¶ 4 At all times pertinent to this case, G.D. lived on Kelly Road in Underhill. One of her close friends, Kaitlyn Corbett, lived with her family on Russin Road, a small, private residential road. Defendant also lived on Russin Road. Although there is no road connecting Kelly Road with Russin Road, a path connects the two.

¶ 5 On May 14, 2001, G.D. and Kaitlyn drove an ATV from the former's home to the latter's home. As they approached the Corbetts' residence, they saw defendant on Russin Road feeding his horse. Defendant was also able to observe the two girls. At that time, defendant was boarding his horse on the Corbetts' property.

¶ 6 After G.D. and Kaitlyn arrived at the Corbetts' home, defendant came toward them, apparently to put his horse in the Corbetts' pasture, which was located near the Corbetts' barn. As he

approached, G.D. brought one of the Corbetts' dogs into the Corbetts' house to prevent it from scaring the horse. She then returned to do the same with another dog. When defendant opened the gate to the pasture, Kaitlyn's horse exited. As the girls attempted to secure Kaitlyn's horse, defendant remained within proximity to the girls and watched. He offered to help, but Kaitlyn declined his offer. Though Kaitlyn asked defendant to leave, he did not do so.[1] Defendant remained in proximity to G.D. for approximately fifteen minutes, following her with both his eyes and body posture. At one point defendant was no more than ten feet from G.D. Eventually, defendant left.

¶ 7 The following day, May 15, G.D. was waiting for the school bus with Kaitlyn at a bus stop located at the bottom of Russin Road. According to G.D.'s testimony, defendant saw her as he drove up, stopped, then called to his own daughters who were also waiting at the bus stop. He rolled down his window and kissed both of his daughters. He stared at G.D. during this event, which lasted approximately four minutes. No evidence was presented regarding the physical distance between defendant and G.D.

¶ 8 Three other incidents involved defendant staring at G.D. One was brief and involved defendant pulling onto Russin Road, seeing G.D. at the Corbett residence, and slowing down and staring at G.D. as he drove past. The other lasted over an hour and involved defendant continually staring at G.D. while she was riding her horse. On a third occasion,

defendant and his wife were walking their horses down Russin Road. G.D. and others were at the Corbett residence helping a veterinarian treat one of the Corbetts' horses. When defendant and his wife came within fifty feet of the group, they stopped briefly, then turned and went back toward their own home. Defendant's wife testified that as soon as she saw G.D. she told defendant, "She's here. We need to turn around and go back home." Defendant, according to his wife, agreed. When asked why she made that statement to her husband, she testified "he is not allowed to have contact with her." The trial court found that while these three instances did not constitute contact, they provided circumstantial evidence from which it could be inferred that the two May incidents were not inadvertent.

¶ 9 The trial court found that the defendant had violated the "no contact" condition of both his probation and the deferred sentence warrant. It directed the court clerk to set a time for sentencing. Defendant appeals the trial court's decision to this Court.

¶ 10 The first claim defendant makes on appeal is that neither of the two events relied upon by the court to revoke his probation amounted to "contact" in violation of the "no contact" provision of his probation. Findings of fact fairly and reasonably supported by any credible evidence must stand. *State v. Sanborn*, 155 Vt. 430, 436, 584 A.2d 1148, 1152 (1990). This Court will uphold the trial court's legal conclusions if reasonably supported by its factual findings. *Id.*

¶ 11 As described in the trial court's findings, the first probation violation the court relied upon to revoke defendant's probation took place on May 14. Defendant saw G.D. and Kaitlyn ride an ATV to Kaitlyn's home. Despite the probation officer's instruction not to "be down there [at Kaitlyn's residence] when [G.D.] is down there," defendant placed himself in physical proximity to G.D. and remained

---

[1] The dissent takes issue with the trial judge's interpretation of the evidence and his finding that Kaitlyn asked defendant to leave. Apparently defense counsel interpreted the testimony in the same manner and conceded in closing argument that Kaitlyn had asked defendant to leave.

there for approximately fifteen minutes, even after Kaitlyn had asked him to leave. This reasonably supports the trial court's conclusion that defendant intentionally placed himself in physical proximity to G.D. in violation of the "no contact" condition of his probation.

¶ 12 The court further found that on May 15, when defendant placed himself in proximity to G.D. at the bus stop and stared at her, he intentionally violated the "no contact" provision of his probation. The court opined that to avoid violating this provision he should have driven by the bus stop without stopping near G.D. On appeal, defendant claims that since there was no evidence or testimony regarding his distance from G.D. during this event, the court could not infer that he was close enough to be within "proximity" to her. This Court may presume that the lower court properly inferred essential facts from its factual findings. *Plant v. Ahlberg*, 104 Vt. 16, 19, 156 A. 535, 536 (1931). Both G.D. and defendant's daughters were waiting at the same bus stop. There is no reason the court could not properly infer that by coming near his daughters at their bus stop while he knew G.D. was also present, defendant purposely put himself within physical proximity to G.D. See *State v. J.T.*, 683 A.2d 1166 (N.J. Super. Ct. App. Div. 1996) (using totality of circumstances to draw inferences is an acceptable practice for a trial court).

¶ 13 Defendant also claims that he was not given fair notice of what constituted "contact" for the purposes of the "no contact" provision of his probation. "Due process requires that the defendant receive fair notice as to what acts may constitute a violation of his probation, thereby subjecting him to loss of liberty." *State v. Gleason*, 154 Vt. 205, 216, 576 A.2d 1246, 1252 (1990) (internal quotations omitted). When a violation of a condition would not by itself amount to a criminal act, due process mandates actual notice. *Mace v. Amestoy*, 765 F. Supp.

847, 849 (D. Vt. 1991). "The instructions and directions given to a defendant by a probation officer or the court can also serve to provide fair notice." *Gleason*, 154 Vt. at 216, 576 A.2d at 1252.

¶ 14 We will not disturb the trial court's finding regarding notice if the record contains any credible evidence that fairly and reasonably demonstrates that defendant received fair and actual notice. See *id.* at 217, 576 A.2d at 1255. Defendant's probation officer testified that she met with defendant to review his probation conditions and explain what was expected of him. With regard to the "no contact" provision, the probation officer instructed defendant that "he's not to have any contact with [G.D.]," and when G.D. was at the Corbetts' home, he should not be. Despite this instruction, defendant intentionally placed himself within proximity to G.D. on both May 14 and May 15, 2001.

¶ 15 The trial court reasoned that defendant was put on fair notice of what constituted contact because "contact" is an ordinary term, and it was used in accordance with its everyday meaning. On appeal, defendant argues that the court used only one of many definitions of "contact" available in other dictionaries. He further argues that these other definitions do not contain the idea of "proximity," which was integral in the court's conclusion. The existence of multiple definitions of a common term does not render that term ambiguous or vague.[2]

---

[2] Defendant relies on The American Heritage Dictionary, Second College Edition, 1985, in support of his contention that proximity is not a form of "contact." This Court notes, however, that an updated version of that dictionary has amended its definition of "contact" to include: "[T]he state or condition of touching or of *immediate proximity* . . . [V]isual observation." The American

*Douglas v. State,* 747 A.2d 752, 757 (Md. Ct. Spec. App. 2000). Expecting mathematical certainty of language is unreasonable. *State v. Schmitz,* 617 N.W.2d 908 (Wis. Ct. App. 2000) (internal citation omitted). It is not unreasonable for the trial court to expect a person to understand that proximity is contained within the ordinary meaning of contact. *City of Defiance v. Mohr,* 1991 WL 104348 (Ohio Ct. App. 1991) (holding proximity within the definition of "contact"). Moreover, this Court has found proximity contained within the meaning of contact. In *State v. Leggett,* 167 Vt. 438, 709 A.2d 491 (1997), this Court found support for a violation of probation when the defendant was in a home where two girls under the age of sixteen were present and the terms of his probation prohibited contact with children under that age. Other than mere presence, the decision in *Leggett* reflects no communication or physical contact to support the finding of a violation. See *id.* Accordingly, defendant can fairly be charged with notice that the intentional placement of himself in physical proximity to his former victim qualifies as contact.

¶ 16 Defendant misunderstands the purpose of a "no contact" order by minimizing the two May incidents as "brief, public, and inadvertent." The purpose of a "no contact" order is to protect the victim from future occurrences of the behavior which initially resulted in the order. *State v. Schultz,* 48 P.3d 301, 309 (Wash. 2002); cf. *Rockhold v. Dist. Court for Muscatine County,* 2002 WL 570718 (Iowa Ct. App. 2002). Furthermore, the trial court found that these incidents of contact were not inadvertent, but intentional. See *Benson v. Muscari,* 172 Vt. 1, 4, 769 A.2d 1291, 1295 (2001) (State must show only that defendant intended to do the act that constituted the violation). The court considered other incidents

Heritage Dictionary, Fourth Edition, 2000 (emphasis added).

involving defendant and G.D. which, while not amounting to probation violations, provided circumstantial evidence that the violations found were intentional. The court may properly make circumstantial inferences regarding whether contact was accidental. See *Commonwealth v. Tate,* 612 N.E.2d 686, 689 (Mass. App. Ct. 1993) (judge in probation revocation proceedings could find that defendant's presence on the street where victim lived was not coincidental and that defendant's encounter with her had been contrived by him).

¶ 17 The trial court correctly found that defendant intentionally engaged in conduct that violated the "no contact" provision of his probation. The record, as summarized above, supports the court's finding that defendant had fair notice of what was required of him while on probation.

*Affirmed.*

¶ 18 **Dooley, J.,** dissenting. Defendant has engaged in conduct that is undesirable and upsetting to the minor victim of the sex crime for which he has been convicted and is on probation. On numerous occasions he has placed himself in the position to watch and stare at the victim, on one occasion for more than one hour. During none of these incidents has defendant attempted to touch the victim, to communicate with her, or to seek communication from her.

¶ 19 I agree that probation conditions could have been crafted to prevent defendant's actions and should have been so crafted. One of the ironies of this case is that the court has now redrafted the conditions to draw very clear lines that prohibit defendant's actions. However, I cannot agree that the probation conditions that were in effect clearly prohibited defendant's actions or gave clear notice of what was prohibited. This deficiency is exacerbated by two additional factors: (1) one of the violation holdings — that related to the bus stop incident —

is not supported by sufficient findings or evidence; and (2) the initial probation conditions and actions of the probation officer made inevitable that there would be "contact," as defined by the trial court, between defendant and the victim.

¶ 20 The result, I fear, is that we are punishing defendant not because he violated the conditions imposed upon him, but because he violated the conditions that hindsight shows should have been imposed upon him. I cannot conclude that this result is consistent with the fundamental fairness that should pervade a decision to incarcerate a probationer and, therefore, dissent.

¶ 21 The complaint that started this case contained a one paragraph affidavit of the probation officer, reporting a statement of the victim that defendant was watching her and would not leave the Corbett barn immediately when he saw her. The victim said that defendant was "making her feel uncomfortable with his presence." The complaint did not suggest that the violation consisted of defendant placing himself in the "proximity" of the victim. Nor was there any allegation that defendant tried to communicate with the victim or touch her.

¶ 22 In finding "contact" in two of the five incidents reported by the probation officer, the trial court relied upon an alternative definition found in one dictionary. The definition is: "b. The state or condition of touching or of immediate proximity." As defendant pointed out, the dictionary definitions of "contact" vary, but only a few go beyond actual touching — that is, physical contact — or communication; neither of which is found here. See 3 The Oxford English Dictionary 805-06 (2d ed. 1989); Webster's Third New International Dictionary 490 (1965); The American Heritage Dictionary 395 (4th ed. 2000). We do not give fair notice of the obligations created by probation conditions by adopting a meaning that the probationer can ascertain only if he has the right dictionary.[3]

¶ 23 While the definition adopted by the trial court is debatable, I think the next leap of logic is not. The trial court went on to drop the modifier "immediate" and held that presence in proximity to the victim is sufficient. In this logical leap, the notion that proximity can be so close as to be the functional equivalent of touching is lost.

¶ 24 There is still a third logical leap in the finding of a breach of the condition in the bus stop incident. The State failed to show how close to the victim defendant came when he greeted his children. The evidence was merely that defendant stopped his car and called to his children to come to the car. The majority skates over this with the observation that "the lower court properly inferred essential facts from its factual findings" because

---

[3] The majority suggests we adopted this definition in *State v. Leggett*, 167 Vt. 438, 709 A.2d 491 (1997), a case in which the defendant's probation condition prohibited any contact with a child under sixteen years of age and in which the evidence showed the defendant was residing with, or was frequently in the home of, a woman and her seven-year-old daughter who called him uncle. The definition of "contact" was not raised in *Leggett*, probably because the defendant would find it hard to argue that he was frequently present in the house with the child, acting as a relative, but made no contact with the child, whatever the definition of the term. The comparison to *Leggett* is, if anything, a demonstration of how elastic the definition of "contact" can be to fit the facts, exactly my concern. The suggestion of the majority is that continuous presence in the home with a child is the same "contact" as presence in a car by a bus stop some unknown distance from the victim who is standing outside.

defendant came "near his daughters at their bus stop while he knew G.D. was also present." Even if I agreed that a court can infer essential facts without evidence, I cannot accept the slow loosening of the definition of contact in which physical contact goes to immediate proximity and then to proximity and finally to being near. Oddly, in response to one of the other charges, the trial court found that being fifty feet from the victim was not sufficient proximity to be a violation of the condition. Nothing in the testimony shows that defendant and the victim were within fifty feet of each other at the bus stop.

¶ 25 To be sure, I do not believe that the trial court can infer essential facts with no evidence to support the inference. Our precedents require that the court's conclusions be supported by its findings and by the evidence. See *State v. Austin*, 165 Vt. 389, 397, 685 A.2d 1076, 1082 (1996). The case on which the majority relies deals with mental elements that are mixed questions of fact and law in a civil case. *Plant v. Ahlberg*, 104 Vt. 16, 19, 156 A. 535, 536 (1931), is a deceit case in which the trial court found that the defendant defrauded the plaintiff in the sale of a truck without finding specifically that the defendant intended to deceive the plaintiff or that the plaintiff relied on the defendant's misrepresentation in deciding to buy the truck. This Court held that these elements of the tort could be inferred from the facts found. *Id.* The important point about *Plant* is that mental elements almost always have to be inferred from subsidiary facts, and the evidence existed to make that inference. Here, the element of physical distance, made an element by the court's construction of "contact," cannot normally be inferred from other facts, and, in any event, no subsidiary facts or evidence from which to draw such an inference are present in this case.

¶ 26 I would reverse the decision to revoke probation based on the bus stop incident. Since we cannot know what sentence would have been imposed if the court had found one, but not two, violations of probation conditions, this reversal alone would require a remand for resentencing. See *State v. Higgins*, 147 Vt. 506, 508, 519 A.2d 1164, 1166 (1986) (per curiam).

¶ 27 I would not, however, remand because I would reverse both probation violation conclusions. I acknowledge that the validity of the second violation determination, based on the Corbett residence incident, is closer, primarily because of the instructions of the probation officer and the evidence of specific distance, but I still do not believe the violation could be found on the court's theory.

¶ 28 First, the court never found that defendant violated the specific instructions of the probation officer, probably because they were phrased as advice and not as a command. Thus, the majority has relied upon facts not found by the trial court.[4] In fact, the trial court's decision rests on the same proximity theory as employed in finding a violation for the bus stop incident. As stated above, I cannot accept that theory.

¶ 29 Second, a probation officer can give direction within the contours of the court's probation condition but cannot create a condition different from that imposed by the court. See *State v. Moses*,

---

[4] Although it is not determinative, I also disagree with the finding of the trial court, albeit stated in the court's conclusions, and relied upon by the majority, that Kaitlyn Corbett "asked [defendant] . . . to leave." The finding is clearly erroneous. Both the victim and Kaitlyn testified that Kaitlyn told defendant that his presence was unnecessary to help retrieve her horse so he could leave. Neither asked him or told him to leave. The fact that defense counsel did not dispute this finding does not create evidence where there is none.

159 Vt. 294, 300, 618 A.2d 478, 481 (1992). The court imposed a prohibition on contact, not a distance or presence restriction, and the probation officer had no power to amend that restriction.

¶ 30 Third, and most important, the probation officer's direction was ambiguous, if not contradictory. The exact phrasing of the language relied upon by the majority is: "he *shouldn't* be down there when she is down there." (Emphasis supplied.) This is not the language of command, as asserted by the majority. I suspect, as I stated above, that the phrasing of the statement is why the trial court never mentioned it in its findings.

¶ 31 I say "contradictory" because the probation officer also later authorized defendant to move back into his house nearby to the Corbett residence[5] and allowed him to board his horse in the Corbett pasture.[6] Given these actions and the fact that the victim's good friend was a Corbett daughter, it was almost certain that defendant and the victim would come in proximity with each other. Thus,

if presence in proximity of the victim is the violation, the actions of the probation officer virtually insured that the violation would occur.

¶ 32 The trial court's approach in this case is reminiscent of the trial court's approach in *State v. Goyette*, 166 Vt. 299, 691 A.2d 1064 (1997), in which the defendant was convicted by jury of violating an abuse prevention order by harassment of the victim under a definition of "harassment" so broad that "virtually any conduct by defendant causing disagreement between the parties or concern on the part of the complainant could have resulted in defendant's criminal liability." *Id.* at 303, 691 A.2d at 1067. We reversed because the breadth of the charge went beyond any reasonable definition of harassment. *Id.* at 304, 691 A.2d at 1067. Here, the term "contact" has been defined unreasonably broadly to cover conduct because it bothers the victim. For the same reason that we reversed in *Goyette* we should do so here.

¶ 33 In summary, when we are dealing with the liberty of the probationer, I believe we must insist that probation conditions contain the kind of bright line that enables the probationer to know precisely what is expected of him. Ironically, the trial court recognized this in resentencing defendant to jail time and new probation conditions. Those conditions provide:

> 22. Defendant is not to place himself intentionally within 200 feet of G.D. or remain within 200 feet when her presence becomes known. Anytime defendant is notified of G.D. visiting the Corbett residence or observing G.D. at the Corbetts, defendant is not to place himself or remain in view of G.D. or of Corbett's residence. When driving on Russin Road, defendant is to maintain an appropriate

---

[5] According to the probation officer, defendant was initially prohibited from overnight presence at his home. During this time, he was allowed to be present at any time during the day, and he routinely stayed throughout the day at his home. On June 1, after both the bus stop and Corbett residence incidents, the probation officer allowed defendant to return to overnight residence at his home. Apparently, she knew of both incidents when she removed the restriction on overnight presence.

[6] At the same time as she allowed defendant to resume overnight residence at his home, she prohibited defendant from being on the Corbett property without the consent of the Corbetts, which apparently never was given. The evidence suggests that in response to this restriction defendant moved his horses to an adjoining pasture owned by his brother.

speed and not take special notice of what is happening on Corbetts property.

23. "Contact" includes physical proximity and any form of communication.

If the original sentence had contained comparable conditions, I doubt this case would have arisen. The defendant is entitled to predictable restrictions, but did not receive them here.

¶ 34  I dissent.