2013 VT 109

## State of Vermont v. Tyler Smith Waters

[87 A.3d 512]

No. 11-319

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed November 15, 2013

*Ashley A. Harriman*, Windham County Deputy State's Attorney, and *Robert D. Lees*, Law Clerk (On the Brief), Brattleboro, and *Evan P. Meenan*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Dawn Matthews*, Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** This case calls upon us to determine whether it was plain error to instruct a jury that it could convict defendant

for violating an abuse-prevention order prohibiting him from harassing petitioner if it concluded that he engaged in conduct that would cause a reasonable person to be "annoyed, irritated, tormented or alarmed." We conclude that the instruction was plain error, and that the evidence below could not support a conviction for violating the abuse-prevention order, as worded. We accordingly reverse, and remand for entry of a judgment of acquittal.

¶ 2. Complainant and defendant Tyler Waters lived together for several years and have a minor child together. In 2009, after they broke up, complainant got a relief-from-abuse (RFA) order against defendant. For various reasons, the terms of the order were modified more than once. The October 2009 modified final RFA order was based on findings that defendant had abused complainant, there was a danger of further abuse, and defendant represented a credible threat to complainant's safety. The order prohibited defendant from, among other things, abusing, threatening, stalking, or harassing complainant. It prohibited defendant from communicating or attempting to communicate directly or indirectly with complainant, *except* that it specifically stated, "[d]efendant may have contact by telephone only." The order placed no limitation on the frequency, timing, or subject matter of telephone contact.[1]

¶ 3. The court did not make any findings that defendant had abused the then-two-year-old child, or that defendant posed any threat to the child's safety. It authorized defendant to have telephone contact with the child on Friday evenings, and provided for weekly contact between defendant and the child at a specified visitation center in accordance with center rules and regulations.

¶ 4. In December 2009, complainant reported to the police that due to the volume of communications from defendant she felt

---

[1] The State argues that the RFA order was modified to allow defendant to contact complainant for the specific purpose of setting up weekly telephone calls with the minor child. While this may have been the purpose of the allowed telephone contact, by its terms, the order did not limit defendant to calling at a particular time, for a particular purpose, or for a limited number of times. Such limitations would have been useful in preventing the unwanted contact in this case.

We note that the order did not specifically differentiate between telephone voice calls and text messages. Because the State has assumed that text messages were permitted by the order under the general category of "contact by telephone," we do not reach this question. Given the prevalence of communication via text messaging, it is advisable in the future for the family division to specify in RFA orders whether this type of contact is permitted or prohibited.

"harassed, bullied, and made to feel guilty." Complainant told police that defendant had sent her around forty text messages in a one-month period and had called her over thirty times.

¶ 5. The State charged defendant with violating the RFA order; in particular, the State alleged that defendant had violated the prohibition against harassing complainant. Because defendant had previously been convicted of violating an RFA order, this was a second offense, and defendant was subject to up to three years imprisonment, a fine of $25,000, or both. 13 V.S.A. § 1030(b).

¶ 6. Before the trial started, the court distributed proposed jury instructions to the parties. Both the State and defendant agreed with the court's proposed instruction on harassment. Accordingly, in its pretrial instructions to the jury, the court defined harassment as follows:

> To harass another person means to intentionally engage in a course of conduct directed at that person which would cause a reasonable person to be annoyed, irritated, tormented, or alarmed. The conduct might consist of words, gestures, offensive touching, telephone calls, text messages, or other acts. In this context harassment required proof of active or intentional participation by [defendant]. The mere fact that [complainant] may have been bothered by or that she disagreed with defendant's actions is not enough by itself to show that [defendant] is guilty of harassment. Also, the word harassment means that defendant's conduct was persistent. A single inadvertent incident is not harassment, whereas persistent, repeated, annoying conduct directed at another person may be found to be harassment.

¶ 7. At trial, complainant read aloud each of defendant's texts and explained the context. Some texts simply related to defendant's weekly telephone call or his weekly visit with the child, or other nuts-and-bolts matters. For example, he texted, "[g]rab stuff if you want later," apparently in reference to the clothes complainant had left at defendant's house. In other texts, defendant suggested meetings or outings with complainant and the child even though the RFA order did not allow defendant other-than-telephone contact with complainant. For example, defendant texted: "Lunch or dinner? Am bored. Hope you feel better. Can watch [the child] or fetch something if you need. Hi, [child's name]. Let's check Okemo out."

¶ 8. In many texts, defendant made overtures to reestablish his relationship with complainant or expressed his loneliness or longing to reconcile. For example, defendant texted: "Hi. Getting in. It's after work. Call me. Not sure what phone you got. I love you two. Wish to end no-contact soon. Let's be more normal. No more courts and such. What you think?" Another time he wrote: "Have not any better friend than u. All alone all the time. Wish wuz with u 2. Call me if you need. Till Fri."

¶ 9. Many if not most texts wove together two or more of these threads. For example, the day before a scheduled visit with the child, defendant texted: "Got few minutes if you wanted to call. If not, okay. I wish we could get together. Miss you two way too much. All I think about. Sorry to bother you. Sneakers on [the child] tomorrow. Love you." And, finally, defendant appears to have sent some texts in response to messages from complainant. For example, one text began with the words, "[t]hat is awesome," and was apparently a response to complainant's instruction that he could bring snow pants to the next day's visit.

¶ 10. All told, the State presented evidence of approximately thirty-seven text messages from defendant to complainant spanning approximately a thirty-seven-day period. The average rate of messaging during this period was one per day, although, in fact, many of the text messages were clustered in clumps around events or interactions, so often several days (ranging from two to five) passed between text communications. Defendant did not threaten harm to any person or property in any of the texts, and none of the texts contained language that was profane, threatening, intimidating, or violent.

¶ 11. The complainant testified that the texts were unwelcome, and that she did not think defendant was supposed to be communicating with her. She said, "I believe there were a couple of phone calls that occurred that I know there were a few times where we spoke together — where I believe in these phone calls I actually asked him to stop — stop constantly texting me and calling, . . . the way I understood was he wasn't supposed to be talking to me." There was no evidence as to when complainant made these requests.[2]

---

[2] Although the State's initial charge also referenced phone calls between defendant and complainant, the evidence at trial focused almost exclusively on the text messages.

¶ 12. At the close of the State's case, defendant moved for a judgment of acquittal. Defendant argued that thirty-seven texts over a one-month period is not something a reasonable person would find harassing. Defendant claimed that he had not intentionally acted to harass and there was no evidence to demonstrate that a reasonable person would find his messages harassing. Defendant claimed that even the complainant described the behavior as irritating rather than annoying. The court denied the motion, concluding that a reasonable person could be annoyed or tormented by repeated requests from a prior abuser for face-to-face contact in contravention of an RFA order. Defendant did not testify, and the case was submitted to the jury.

¶ 13. In the jury charge, the court repeated the substance of its pretrial instruction including its explanation that to harass a person "means to intentionally engage in a course of conduct directed at that person which would cause a reasonable person to be annoyed, irritated, tormented, or alarmed." Defendant did not object to the court's instruction.

¶ 14. During its deliberations, the jury submitted a question to the judge asking if there was a legal definition of "tormented" and "annoyed." The court responded that there was no further legal definition and instructed the jury to apply the "common definitions." The jury returned a guilty verdict, and defendant filed a timely notice of appeal.

¶ 15. On appeal, defendant argues that the court's jury instruction on harassment was overly broad, and that the evidence of harassment in this case was insufficient to convict defendant of violating the abuse-prevention order.

¶ 16. ██ We begin with defendant's challenge to the jury instruction. Because defendant did not object to the court's jury instructions at trial, our review on appeal is limited to plain error. See V.R.Cr.P. 52(b); *In re Carter*, 2004 VT 21, ¶ 21, 176 Vt. 322, 848 A.2d 281 ("Since petitioner failed to object to the jury instructions, he must show plain error."). Plain error review of jury instructions assesses the instructions as a whole "to determine if they breathe the true spirit of the law, and if there is no fair ground to say that the jury has been misled." *State v. Rounds*, 2011 VT 39, ¶ 22, 189 Vt. 447, 22 A.3d 477 (quotation omitted). A claim of error only rises to the level of "plain error" if (1) there is an error; (2) the error is obvious; (3) the error

affects substantial rights and results in prejudice to the defendant; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *State v. Herrick*, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285.

¶ 17. ■ We note at the outset what this case is and is not about. This case is not about whether an abuse-prevention order can prohibit the type of conduct defendant undisputedly engaged in here. Vermont's abuse-prevention statute specifically provides that an RFA order may include:

> an order that the defendant refrain from abusing the plaintiff, his or her children, or both and from interfering with their personal liberty, *including restrictions on the defendant's ability to contact the plaintiff* or the children in person, by phone, or by mail and restrictions prohibiting the defendant from coming within a fixed distance of the plaintiff, the children, the plaintiff's residence, or other designated locations where the plaintiff or children are likely to spend time.

15 V.S.A. § 1103(c)(2)(A) (emphasis added). There is no question that an RFA order can prohibit conduct such as defendant's serial texting of complainant, and that the State can criminally prosecute individuals who violate such prohibitions. See *Benson v. Muscari*, 172 Vt. 1, 4, 769 A.2d 1291, 1294 (2001) (acknowledging that provisions in RFA order may "prohibit what otherwise may be viewed as inoffensive contact before it matures into further incidents of abuse"); *State v. Goyette*, 166 Vt. 299, 302, 691 A.2d 1064, 1066 (1997) ("[A] relief-from-abuse order may prohibit otherwise legitimate conduct to prevent future abuse, and that conduct may serve as the basis of a criminal conviction for violating the order.").

¶ 18. ■ Had the RFA order in this case prohibited defendant from contacting complainant by telephone, or limited the subject matter of his communications solely to arrangements concerning scheduled telephone calls, visits with the parties' child, or communications necessary to protect the child's well-being, this would have been an open-and-shut case. But the State does not suggest that the frequency or subject matter of defendant's text messages ran afoul of any specific limitations on defendant's contact with complainant other than the prohibition against harassment. The

240

law can only punish defendant "because he violated the conditions imposed upon him, [not] because he violated the conditions that hindsight shows should have been imposed upon him." *State v Danaher*, 174 Vt. 591, 595, 819 A.2d 691, 696 (2002) (mem.) (Dooley, J., dissenting). Accordingly, the central question in this case is whether the RFA order actually issued in this case sufficiently notified defendant that he could be convicted for violating the order's prohibition on harassment on the basis of his text messages if a jury concluded that the messages "would cause a reasonable person to be annoyed, irritated, tormented, or alarmed."

¶ 19. ■ In order to answer this question, we have to determine what "harassment" means in the context of an RFA order *when it is not otherwise defined*. Given the consequences of violating an RFA order — including criminal prosecution and a sentence of imprisonment — in construing the order, we must ensure that a defendant has notice "of what circumstances will constitute a violation." See *State v. Sanville*, 2011 VT 34, ¶ 8, 189 Vt. 626, 22 A.3d 450 (mem.) (discussing requirement that probation order provide clear notice of what conduct will violate the order). "Due process requires that such notice inform him as to what acts may constitute a violation of [the order], thereby subjecting him to loss of liberty." *Id.* (quotations omitted); see also *State v. Frechette*, 161 Vt. 233, 235-36, 637 A.2d 1080, 1082 (1993) ("To be enforceable, criminal statutes . . . must define a criminal offense with sufficient certainty so as to inform a person of ordinary intelligence of conduct which is proscribed, and such that arbitrary and discriminatory enforcement is not encouraged." (quotations omitted)).

¶ 20. Vermont's abuse-prevention statutes do not even mention, let alone define, the term "harassment." See 15 V.S.A. §§ 1101-1115. However, the standard RFA form order used in the family division includes a check-box that allows the court to order that "[d]efendant shall not threaten or harass" the plaintiff and/or minor children. The form order likewise does not define the term.

¶ 21. ■ We have previously determined that conduct must do more than subjectively bother another person in order to violate the prohibition of harassment in RFA orders. *Goyette*, 166 Vt. at 303, 691 A.2d at 1067. In *Goyette* we considered a violation-of-an-abuse-prevention-order (VAPO) conviction arising from a series of actions by the defendant subject to an RFA order containing a

"no harassment" condition. The trial court's instruction defined harassment as "to engage in repeated acts which trouble, worry, torment, disturb or threaten another." *Id.* Concluding that "the court's broad definition of harassment permitted defendant to be convicted on the basis of virtually any behavior that bothered the complainant," we reversed the conviction. *Id.* at 304, 691 A.2d at 1067.

¶ 22. Although we determined that the described conduct did *not* rise to the level of harassment, we did not lay out exactly what *does* qualify as harassment in the context of RFA orders. We declined the defendant's request to define harassment to require "that the alleged acts were committed for no legitimate purpose and caused the complainant emotional distress," noting in passing that "[a] definition of harassment could conceivably vary depending on the circumstances of individual cases."[3] *Id.*

¶ 23. ■ This case calls upon us to answer the question we left open in *Goyette*. As we suggested in *Goyette*, the question of whether particular conduct constitutes harassment may be very context dependent. Seemingly innocuous statements or conduct may take on very different meaning when understood against the backdrop of a history of violence or threats of violence. See also *State v. Hinchliffe*, 2009 VT 111, ¶ 25, 186 Vt. 487, 987 A.2d 988 (explaining that context of past events is important to determining whether victim had objectively reasonable fear of bodily injury from defendant's actions). But the definition of harassment itself cannot be a moving target if the standard provision in the family division RFA order is to provide fair notice to defendants and a fair basis for prosecuting them for violating those orders.

¶ 24. In trying to determine the appropriate definition of "harassment" in this context, we are struck by the widely divergent definitions and understandings of the term in various contexts.

---

[3] We subsequently declined to provide a specific definition of harassment for the purpose of a VAPO action in *State v. Premo*, 168 Vt. 600, 719 A.2d 398 (1998) (mem.). In that case, the trial court had used the definition of harassment that appears in Vermont's stalking statute, and the State sought interlocutory appeal. The record was scant, the State had not offered any alternative definition of its own, and the briefing was one-sided because the defendant had not filed a brief. Given these factors, we concluded that the case was not appropriate for interlocutory review. *Id.* at 600, 719 A.2d at 399.

Vermont's stalking statute is the only provision in Vermont's criminal laws that purports to define the term.[4] That statute provides:

> "Harassing" means actions directed at a specific person, or a member of the person's family, which would cause a reasonable person to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death, including but not limited to verbal threats, written, telephonic, or other electronically communicated threats, vandalism, or physical contact without consent.

13 V.S.A. § 1061(4). The statute prohibiting disturbing the peace by electronic communication does not define harassment, but states that "[a]n intent to terrify, threaten, harass or annoy may be inferred by the trier of fact from the use of obscene, lewd, lascivious or indecent language or the making of a threat or statement or repeated anonymous telephone calls or other electronic communications." *Id.* § 1027(b).[5]

---

[4] Other provisions in Vermont's criminal code use the term, but do not specifically define it. See, e.g., 13 V.S.A. § 352 (animal cruelty); *id.* § 1380 (financial exploitation); *id.* § 1456 (burning of religious symbols); *id.* § 5411a (prohibiting harassment of individuals listed on sex offender registry); *id.* § 7554 (contacting witnesses while on pretrial release).

[5] Other states have adopted a variety of definitions of harassment in stalking and harassment-prevention statutes. See, e.g., Me. Rev. Stat. Ann. tit. 5, § 4651(2)(A) (2012) (defining harassment to mean: "Three or more acts of intimidation, confrontation, physical force or the threat of physical force directed against any person, family or business that are made with the intention of causing fear, intimidation or damage to personal property and that do in fact cause fear, intimidation or damage to personal property."); Minn. Stat. Ann. § 609.748(a)(1) (West 2012) (including in definition of harassment, in addition to physical or sexual assault, "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another"); N.C. Gen. Stat. Ann. § 14-277.3A(b)(2) (West 2008) (defining harassment as conduct "that torments, terrorizes, or terrifies that person and that serves no legitimate purpose"); Wash. Rev. Code Ann. § 10.14.020(2) (West 2011) ("'Unlawful harassment' means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress to the petitioner . . . ."); Wis. Stat. Ann. § 813.125(1)(b) (West 2012) (defining harassment to include, in addition to threatening to or actually sexually assaulting, abusing, stalking, or physically contacting,

¶ 25. Vermont's civil statutes use the term "harass" very differently. See, e.g., 16 V.S.A. § 11(a)(26)(A) (defining "harassment" as "incident or incidents of verbal, written, visual, or physical conduct, including any incident conducted by electronic means . . . that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment"); *Washington v. Pierce*, 2005 VT 125, ¶ 3, 179 Vt. 318, 895 A.2d 173 (requiring, as a prerequisite for a claim under Vermont's Public Accommodations Act, that the harassing conduct be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school" (quotation omitted)).[6]

¶ 26. In ordinary usage, the term tends to have an overlapping but different set of meanings. See, e.g., Random House Unabridged Dictionary 870 (2d ed. 1993) (defining "harass" as "1. to disturb persistently; torment, as with troubles or cares; bother continually; pester; persecute. 2. to trouble by repeated attacks, incursions, etc., as in war or hostilities; harry; raid"); see also Black's Law Dictionary 733 (8th ed. 2004) (defining harassment as "[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose").

¶ 27. ▮ ▮ We conclude that, in the absence of any elaboration in the RFA order regarding the intended definition of "harassment" or the type of conduct prohibited, the most appropriate touchstone for defining the term in the context of a VAPO prosecution is the definition in Vermont's stalking statute. We reach this conclusion for several reasons. First, just as "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," a prohibition in an abuse-prevention order, the violation of which can be the basis for a criminal prosecution, should be construed against the State when it is susceptible of

---

"[e]ngaging in a course of conduct or repeatedly committing acts which harass or intimidate another person and which serve no legitimate purpose").

[6] See also 21 V.S.A. § 495d(13) (defining *sexual* harassment in employment-discrimination context to mean unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of sexual nature that satisfies certain requirements).

varying reasonable interpretations. *Jones v. United States*, 529 U.S. 848, 858 (2000) (quotation omitted). Given the multiplicity of meanings associated with the term "harassment," the more restrictive definition reflected in a related statute in Vermont's criminal code is a more appropriate guideline than the extremely broad, everyday usage of the term, which can reach a wide range of bothersome but not necessarily threatening activity.

¶ 28. Second, the purposes of the stalking statute and the RFA statute are aligned; both concern themselves with threatening or violent behavior. The extensive limitations on a defendant's conduct available through an RFA, and the powerful enforcement tool of criminal prosecution that is available to enforce an RFA, are warranted to combat the serious harm that domestic violence inflicts on individuals, families, and our society more broadly. We see no evidence that the Legislature passed the statute to criminalize annoying or bothersome conduct. This is not to say that an RFA cannot prohibit annoying or bothersome conduct. As noted above, it can — not because such conduct is itself the target of the statute, but because in the context of domestic violence, such conduct may "mature[ ] into further incidents of abuse." *Benson*, 172 Vt. at 4, 769 A.2d at 1294. But, given the purposes of the statutes relating to domestic violence, we are not inclined to infer that annoying conduct violates an RFA order in the absence of a more specific statement in the order to that effect.

¶ 29. Third, the order in this case says that "defendant shall not threaten or harass [complainant]." The joining of "threaten" and "harass" in a single prohibition supports the inference that the two concepts are closely related. "Threaten" and "annoy" are different enough concepts that they would not likely share a check-box on the RFA form order. Moreover, this understanding of the meaning of harassment fits better with the litany of other acts prohibited in the order, including threats, stalking, interference with liberty, use of physical force reasonably expected to cause bodily injury, abuse, and acts that create reasonable fear of bodily injury. "Annoying" acts are out of synch with the rest of this list.

¶ 30. We recognize that our construction of the term gives rise to redundancy, but the RFA order itself is rife with redundancy. It prohibits threats, as well as actions that would place the plaintiff "in reasonable fear of bodily injury," as well as stalking — which itself is characterized by threatening conduct. This being

a standardized court order rather than a statute passed by the Legislature, we are not compelled to ascribe a nonredundant meaning to every term. If anything, the form uses overlapping terms and categories to ensure that defendants understand their obligations.

¶ 31. ■ We emphasize the limits of our holding. The definition of "harass" in the stalking statute may well be overly narrow in the context of an RFA order, and a court is free to prohibit a defendant from having any contact with a petitioner, or to specifically restrict the mode, substance, and timing of any permitted contact. But, in the absence of a definition of the term in the statutes relating to domestic violence, or a more specific definition in the RFA order itself, the stalking statute offers the best available legal definition to inform our interpretation of this RFA order. For all the reasons persuasively highlighted by the dissent, an RFA order certainly can, and in many cases should, proscribe the kind of conduct engaged in by defendant in this case — conduct that is not unlawful in its own right or even necessarily threatening, but which in the context of a relationship characterized by domestic violence takes on a different significance. However, in the absence of more specific guidance in an RFA order, or from the Legislature, we construe harassment to mean:

> actions directed at a specific person, or a member of the person's family, which would cause a reasonable person to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death, including but not limited to verbal threats, written, telephonic, or other electronically communicated threats, vandalism, or physical contact without consent.

13 V.S.A. § 1061(4). Accordingly, we conclude that the trial court's instruction was erroneous.

¶ 32. ■ We further conclude that the error is sufficiently clear to amount to plain error. The trial court did its best to come up with an instruction to fill the gap this Court left open in *Goyette*. Unaided by a timely objection, it cannot be faulted for adopting a definition of "harassment" that is consistent with some colloquial uses of the term. However, given the considerations outlined above, including the wide range of legal and everyday uses of the

term and the due-process-infused rule of lenity, we conclude that the instruction that allowed the jury to convict defendant on the basis of objectively annoying conduct was clearly error.

¶ 33. We further conclude that defendant was significantly prejudiced by the instruction. The State does not deny that the RFA order expressly allowed defendant to have telephone contact with complainant without express restrictions as to frequency, timing, or content. The State has not alleged that defendant's messages included threatening, menacing, offensive, or lewd content, or that the messages would cause a reasonable person — including a reasonable person with full knowledge and experience of defendant's past abusive conduct — to fear the kinds of harms listed above. As the State acknowledged in its closing argument, "the real question is, did he harass her; was his behavior in that time period . . . harassment." The State's case, and defendant's conviction, rested squarely on the overly broad definition of harassment used in the trial court's jury instructions. That the jury itself struggled to understand the boundaries of the term "harassment" is evident from the questions it asked the court during its deliberations. If the jury instructions had defined harassment consistent with the default definition identified above — one that requires an element of threat — we conclude that the jury could not have convicted defendant on this evidence.

¶ 34. We recognize that defendant's repeated texts to petitioner were insensitive. She would have been entitled to ask the court to modify its order to expressly restrict defendant's text messages to her as to timing, frequency, manner, content, or other parameters. She could have asked the court to prohibit direct contact altogether, substituting an alternate method of arranging for parent-child contact. Against the backdrop of defendant's prior abuse of her, such limitations would have been entirely appropriate. But we cannot say that the communications amounted to threats. The State relies primarily on the frequency of defendant's communications to support its charge. In the face of an order permitting telephone contact without restriction as to frequency, timing, or subject matter, the frequency of defendant's texts by itself cannot support an inference that the conduct was threatening. In this day and age, one text per day, on average, is not a shocking number, especially given the lack of clear evidence that complainant asked defendant to stop texting her before he sent many of those texts. As of spring 2011, 18-29 year-old cell-phone owners send and

receive text messages at an average rate of 87.7 messages a day, and 95% of this age group use the text messaging feature on their phones. Aaron Smith, Pew Inst., *Americans and Text Messaging* 3 (2011), http://pewinternet.org/~/media//Files/Reports/2011/Americans%20and%20Text%20Messaging.pdf.

¶ 35. Given that we conclude that a jury instructed about the definition of "harassment" in the RFA order in a way that is consistent with this opinion could not convict defendant of violating the abuse-prevention order on the basis of the evidence presented below, convicting defendant of a felony on the basis of an overly broad instruction would undermine the fairness of the judicial process.

*Defendant's conviction is reversed and the matter is remanded for entry of a judgment of acquittal.*

¶ 36. **Dooley, J.,** concurring. I fully join the majority opinion. Based on the language of the relief-from-abuse (RFA) order, the relevant law, and the fact that the language of the form order amounts to a definition of a crime when the order is violated, I concur that we should derive the definition of harassment from the stalking statute. I write to suggest a solution to definitional difficulties like the one before us.

¶ 37. I have attached to this concurrence the relevant part of the redacted RFA order from this case. The part in issue consists of a checked box next to the following text: "Defendant shall not threaten or harass," which is followed by another checked box and "Plaintiff." The order, like virtually all RFA orders, is entered on Judiciary Form 152F. While I have not done a study, my sense is that this language has been on the RFA form since 15 V.S.A. § 1103 was passed. 15 V.S.A. § 1103(c)(1), (2). While judges are not required to check any box on the form, this box is routinely checked. As the majority decision points out, the statute requires the court to "make such orders as it deems necessary," and specifically orders certain terms, but does not mention the term "harass." *Id.* Thus, this standard form term was created by the judiciary.

¶ 38. Form orders have advantages in routinizing court action and ensuring that findings are made and order provisions are considered. They tend, however, to create inertia in the process. It is apparent from the prior decisions relied upon by the majority and the dissent in this case that the term "harass" is vague in

this context and has for some time been in need of definition or modification, especially since it becomes the description of a crime where an RFA order prohibiting such is violated. A reconsideration of the form — either by adding a definition to the term "harass" or using a different term — is preferable to a case-by-case review process that enmeshes parties in unnecessary litigation and rarely solves the language deficiency prospectively.

¶ 39. There is a second deficiency in the case-by-case approach which is apparent from this case. I have joined the majority because the decision finds and applies the most appropriate construction of "harass" under the circumstances. In doing so, I am not satisfied that the result leaves us with the optimal terms in the RFA order. Indeed, I would abandon the use of the word "harass" in favor of other terminology or define it in the order in a better way. For me, the worst result is that we leave the standard language as it is. I hope the Family Division Oversight Committee will, in the wake of this decision, modify or define the term in issue.

¶ 40. This concurrence is also stimulated by the fact that the language construction difficulties that are appearing in the context of RFA orders are also present in other contexts — particularly conditions of probation and conditions of pretrial release. Again, I am referring to standard conditions on standardized form orders. I urge that we use the occasion of this decision to revisit each of these form orders that contain optional standard conditions or terms not required by law. Such a review is a far better way of addressing the language issues than more piecemeal litigation like this.

Form 152F w/Children          FINAL ORDER FOR RELIEF FROM ABUSE - Page 1          Page 2 of

| VERMONT FAMILY COURT | County WINDHAM | | | Docket # |
|---|---|---|---|---|
| Plaintiff's Name | Date of Birth | Defendant's Name Tyler Waters | | Date of Birth |
| | Defendant's Street Address | | City, State, Zip | |

Name(s) of the Minor Child/ren who have been abused or require protection:

| A Complaint in this case was filed on: | A Hearing in this case was held on: | The following persons were present. ☒ Plaintiff ☐ with attorney | Name of Attorney |
|---|---|---|---|
| Date 5/7/09 | Date 5/13/09 | ☐ Defendant ☐ with attorney | Name of Attorney |

☒ **FINDINGS BY THE COURT:** (Check the applicable box(es); cross out findings that do not apply.)
  ☒ Defendant has abused ☒ Plaintiff ☐ the minor child/ren in that Defendant has:
    ☒ Caused physical harm.
    ☒ Attempted to cause physical harm.
    ☐ Placed him/her/them in fear of imminent serious physical harm.
    ☐ Stalked ☐ Plaintiff and/or ☐ Minor child/ren, as defined in 12 VSA 5131(6).
    ☐ Sexually assaulted ☐ Plaintiff and/or ☐ Minor child/ren, as defined in 12 VSA 5131(5).
  ☒ There is a danger of further abuse.
  ☐ Defendant is incarcerated and has been convicted of one of the crimes specified in 15 V.S.A. 1103 (c) (b).
  ☒ Defendant represents a credible threat to the physical safety of ☒ Plaintiff ☐ the minor child/ren
  ☐ Defendant has a duty to support the Plaintiff.
  ☐ Defendant has a duty to support the minor child/ren named above.
☐ **FINDINGS WAIVED BY STIPULATION OF THE PARTIES.**

**ORDER OF THE COURT: IT IS ORDERED THAT:**
1. ☒ Defendant shall refrain from abusing ☒ Plaintiff ☐ the minor child/ren and shall refrain from interfering with his/her/their personal liberty.
2. ☒ Defendant shall not use, attempt to use or threaten to use physical force that would reasonably be expected to cause bodily injury against ☒ Plaintiff ☐ the minor child/ren
3. ☒ Defendant shall not do anything that would place plaintiff in reasonable fear of bodily injury to plaintiff or the minor child/ren..
4. ☒ Defendant shall not follow or stalk ☒ Plaintiff ☐ the minor child/ren
5. ☒ Defendant shall not threaten or harass ☒ Plaintiff ☐ the minor child/ren
6. ☒ Defendant shall not telephone, write to, e-mail, contact ☒ Plaintiff ☐ the minor child/ren in any way, or attempt to communicate directly or indirectly with him/her/them through a third party or in any other manner, except that Defendant -may-. have contact by telephone only.

**WARNING!**
If the Plaintiff begins or asks for contact with the Defendant, the Defendant must end that contact unless and until the Court changes this order. The Defendant will violate this order by such contact unless the order specifically permits the contact.

7. ☐ Plaintiff shall have sole possession of the residence located at: _____ (Street and Town Address)
8. ☐ Defendant shall not enter Plaintiff's residence for any purpose except as specifically provided in this order.

**WARNING!**
Unless specifically allowed by this order, Defendant cannot enter the Plaintiff's residence even if the Plaintiff has invited the Defendant. If both Plaintiff and Defendant want to remove this restriction, they must ask the Court to change the order. This order remains in effect until the court decides whether to grant the request.

9. ☐ Plaintiff ☐ Defendant shall obtain his/her personal belongings as follows: _____

9a. ☐ Plaintiff is granted sole possession of the following personal property necessary for the protection of Plaintiff and the care of the child/ren: _____

SEE PAGE 2 FOR ADDITIONAL TERMS OF THIS ORDER.    ALSO SEE "IMPORTANT NOTICES" ON THE BACK OF PAGE 1.
Rev. 9/08 SML   Distribution: Original ~ Served on Defendant & returned to Court;  1 Copy ~ Plaintiff,  1 Copy ~ Defendant;  1 Copy ~ File

¶ 41. **Burgess, J.,** dissenting. It does not take a linguist, a lawyer, or statutes from other states to know that persistently texting your domestic-violence victim to get her within reach, after she has obtained a relief-from-abuse (RFA) order against you and after being told your hectoring is unwelcome, is "harassment" as defined by the trial court below in common parlance. The majority recites that complainant secured an RFA order against defendant based on his abuse, the danger of further abuse

and his credible threat to complainant's safety, *ante*, ¶ 2, but then recounts his pressure on her to resume their relationship as if these overtures were unrelated to the fact that he recently "caused" and "attempted to cause [her] physical harm." The majority summarizes defendant's actions as thirty-seven texts in as many days politely expressing loneliness, love, best friendship and desire to get back together, *ante*, ¶¶ 7-10, and finds it insufficient to prove harassment. To reach this conclusion, the majority instantly redefines harassment to require nothing less than a threat of bodily injury, unlawful restraint, rape or death. The trial court's more mundane instruction, however, was not plainly erroneous, if error at all. The evidence in its entirety, including defendant's abuse of complainant and her testimony that she told him in more than one telephone call to "stop constantly texting . . . and calling" because it caused her stress,[7] supports the charge that defendant harassed her in violation of the RFA order beyond a reasonable doubt. Accordingly, I respectfully dissent from redefining harassment and reversing the jury's guilty verdict.

¶ 42. Adjudged a violent abuser and ordered to stay away from complainant, the evidence was that defendant embarked on a text-messaging campaign to cajole her to return to him — personal contact prohibited by the RFA order. The parties had a child and defendant was granted supervised visitation, and was also allowed telephone contact. As evidenced by the court's order to stay away, defendant knew complainant did not want personal contact with him and why. Yet, he repeatedly texted her not just about child visitation, but about: his "luv" for complainant; his desire to hug her, have lunch with her, have dinner with her, go to California with her, to "patch this," meet her at various places, visit with her, have a quick visit, fetch things for her, ski with her, sled with her, shop with her, bowl with her, and be together; what she wanted for Christmas; his concern for her; him being a

---

[7] Even if the timing of the conversations in which complainant asked defendant to stop constantly texting was not in evidence, as noted by the majority, *ante*, ¶ 11, the clear inference from the fact of more than one such call is that defendant persisted after complainant's first protest. Moreover, even without a protest, the underlying circumstances of physical abuse, threat of harm and the RFA order put a batterer on notice, as the jury essentially determined, that continued, repetitive and unanswered romantic solicitations would be received as harassment by the victim of his domestic abuse.

"mess" and crying without her; that he wouldn't "let [her] down"; whether she had any ideas about what he should do; and missing her. This was all interspersed with how their separation "sucks," that he wanted an end to "no contact," was "ready 4 change" and "real fam time," and that he wanted to be friendly. In a separate message, defendant "regret[ed] past action," said he was "working to be better" and invited complainant "to do coun[seling] together." In yet another, defendant hoped for a "family outing soon." Some of these texts were as frequent as two or three times a day.

¶ 43. The jury unanimously agreed that defendant's texting violated the RFA order's prohibition against harassment as defined by the trial court. This definition, without objection from defendant, was that to harass another person meant to "intentionally engage in a course of conduct directed at that person which would cause a reasonable person to be annoyed, irritated, tormented, or alarmed." The court further instructed that harassment required proof of intentional, persistent and repeated instances of annoying conduct directed at another person, when a reasonable person under the same circumstances would have been so annoyed, irritated, tormented or alarmed by defendant's actions. There appears to be no dispute that defendant's deliberate, near-daily and multiple messaging could be found by the jury as "intentional" and "persistent" conduct "directed" at complainant.[8]

¶ 44. Absent objection to the balance of the instruction, this Court's review is limited to plain error only. *State v. Mead*, 2012 VT 36, ¶ 41, 192 Vt. 1, 54 A.3d 485. Plain error results when four factors are met: there is legal error, the error is obvious, the error affects substantial rights causing prejudice, and the error seriously affects the fairness or integrity of the judicial process. *State v. Rounds*, 2011 VT 39, ¶ 31, 189 Vt. 447, 22 A.3d 477. We

---

[8] The instructions also undermine defendant's efforts to analogize his case to instances where courts have found criminal prohibitions on annoying behavior overbroad in violation of the First Amendment. See, e.g., *People v. Klick*, 362 N.E.2d 329, 330-32 (Ill. 1977) (concluding statute, which prohibited making one annoying phone call, violated First and Fourteenth Amendments because it attempted to prohibit protected speech). As previously held, there is "no First Amendment right to inflict unwanted and harassing contact on another person." *State v. Mott*, 166 Vt. 188, 194, 692 A.2d 360, 365 (1997). Unlike *Klick*, the condition here in no way proscribed single instances of protected speech, but, as applied in this particular case, prohibited an intentional and persistent course of objectively harassing conduct directed towards a prevailing RFA plaintiff.

look to the instructions as a whole and will reverse "only when the entire charge undermines confidence in the verdict." *State v. Carpenter*, 170 Vt. 371, 374-75, 749 A.2d 1137, 1139 (2000). Put another way, "[p]lain error can be found only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *State v. Hoadley*, 147 Vt. 49, 53, 512 A.2d 879, 881 (1986).

¶ 45. Nothing of that sort happened here. The alleged error must be "viewed in context." *State v. Kinney*, 2011 VT 74, ¶ 13, 190 Vt. 195, 27 A.3d 348. Given the specifically described texting behavior in the context of defendant's abuse of complainant, and the resulting RFA order, the court's inclusion of "conduct which causes a reasonable person to be annoyed" within its definition of "harassment" was no obvious error at all. Indeed, it was neither unconstitutionally overbroad nor inherently unfair to hold defendant accountable, and criminally responsible, under the RFA order for relentlessly and deliberately annoying his victim by pestering her by text to return to him.

¶ 46. Only in the abstract can the majority opine that "annoying acts" can never, as a matter of law, suffice for harassment prohibited by an RFA order. *Ante*, ¶ 29. Surely no one should be convicted for mere annoyance lest we all be eventually prosecuted, but that is neither the charge nor a remote danger here. Whether there is fair notice that annoyance can qualify as harassment must depend upon the context of the circumstances in which the RFA was imposed. See *State v. Hinchliffe*, 2009 VT 111, ¶¶ 25-26, 186 Vt. 487, 987 A.2d 988 (explaining that prior conduct and relationship with victim are relevant to question of whether defendant's actions would cause reasonable person in victim's position to be afraid). As charged in conjunction with the specific allegation set forth in the affidavit of probable cause, the jury was not left to ponder if defendant was generally annoying. Instead, the jury was called on to measure the particular conduct of repeatedly seeking to rekindle a relationship with his victim, and lamenting her instigation of their separation vis-à-vis the history of his abuse and a family court order to stay away from her. It was properly left to the jury to decide if his annoyance, by persisting that his domestic violence victim ski, shop, dine, attend counseling and return to him, was objectively prohibited as harassment by the

RFA order. Defendant retained no right to *deliberately* annoy his domestic abuse victim when ordered not to, and no evidence suggests he was intellectually challenged so as not to appreciate that annoying his victim with persistent requests to return would be prohibited by the commonly understood meaning of harassment. See *State v. Danaher*, 174 Vt. 591, 593-94, 819 A.2d 691, 695 (2002) (mem.) (holding due process is satisfied where ordinary language of probation condition would put reasonable person on notice of conduct prohibited).

¶ 47. What the majority misstates as the holding of *State v. Goyette*, 166 Vt. 299, 691 A.2d 1064 (1997), is no more than dicta that fail to compel the majority's result. Defendant and the majority liken this case to *Goyette*, where the trial court's charge was determined erroneous by defining harassment as *"repeated* acts which trouble, worry, torment, disturb or threaten another (emphasis added)" but then instructing that the jury could convict if it unanimously found the defendant committed but one of six alleged acts. *Id.* at 303, 691 A.2d at 1067 (quotations omitted). This Court reversed on appeal, but not, as suggested by the majority, because of an overbroad definition of harassment, *ante,* ¶ 21, but because of plain error in the instruction allowing a conviction based on a single act, rather than the repeated acts required for the offense. *Goyette*, 166 Vt. at 303, 691 A.2d at 1067. No such error occurred here. Although unnecessary to its holding, the Court added that the breadth of the harassment definition was reversible error as potentially criminalizing "virtually any behavior [by the defendant] that bothered the complainant" during an acrimonious divorce. *Id.* at 304, 691 A.2d at 1067. Defendant and the majority contend that the court's instruction here was similarly overbroad because it allowed the jury to convict on irritating or annoying behavior that is less than criminal "harassment" elsewhere defined by the Legislature in the unrelated criminal antistalking statute.[9]

¶ 48. The *Goyette* passage on overbreadth, cited by defendant and the majority, is not binding and is not persuasive. Contrary to

_____

[9] The statute, 13 V.S.A. § 1062, outlaws stalking, which can consist, in pertinent part, of harassment defined as "actions directed at a specific person, or a member of a person's family, which would cause a reasonable person to fear unlawful *sexual conduct, unlawful restraint, bodily injury, or death,* including but not limited to verbal threats, written, telephonic, or other electronically communicated threats, vandalism, or physical contact without consent." *Id.* § 1061(4) (emphasis added).

the majority's characterization, *ante*, ¶ 23, there was no question left open in *Goyette*, because it is black letter law that an instruction contradictory to the necessary elements of an offense — like allowing a single instance to suffice for the necessary multiple instances — is reversible error. The *Goyette* Court's comments on overbreadth were gratuitous, extraneous to its reversal for failure to instruct on the element of repetitive misconduct, and devoid of plain-error analysis. The language relied on by the majority merely assumed the instruction would allow conviction for harassment based on any domestic disagreement whatsoever. It does not explain why the State's particularized charge and evidence of defendant's insults to complainant, criticism of her love life, unwanted and uninvited interference with her parental rights, and his threat to kill her, *Goyette*, 166 Vt. at 302-03, 691 A.2d at 1067, would not suffice for a violation of an RFA order's prohibition against harassment. Whatever unspecified and uncharged "disagreement between the parties" imagined as overbroad in the second part of *Goyette*, *id.* at 303, 691 A.2d at 1067, it was *not* an issue in that case, and the Court's supposed disposition on that ground is immaterial, dicta, and not precedential.

¶ 49. Neither "harassment" nor "annoyance" in the context of the RFA order and the specific actions alleged in this case are concepts so esoteric, as posited by the majority, as to require term-of-art refinements beyond the trial court's instructions. By ninth grade, the difference between harmless impositions and objectively bullying behavior is clear. While the majority would infantilize RFA defendants, the instant defendant need not have meditated long over any quandary about the meaning of no-harassment — by simply following the RFA order's primary mandate to let complainant alone. The jury here was not, as feared by the majority, asked to judge if defendant was generally annoying and irritating, but to determine if his unrequited texts of love and desire for physical proximity, over and over again, to a victim of his violence who explicitly did not want such contact, was annoying harassment prohibited by the RFA order. If defendant repeatedly texted his domestic violence victim "wish wuz with u 2" and "luv u" once, twice or thrice daily, after being served with a stay-away and no-harassment RFA order, would it not be objectively annoying to the point of harassment? The majority says "no," while the jury said "guilty." Given the evidence and the real circumstances presented by the State in this case, the jury's

verdict was supported, and the majority's conclusion to the contrary is not.

¶ 50. Left for discussion, then, is the majority's perception of defendant's insistent professions of need, "luv," longing and fixation on reunification as insufficiently concerning to harass complainant, a victim of his past and threatened future domestic abuse and injury. Omitted from the majority's equation is that defendant was not just a disaffected former boyfriend, but was, boiled down to blunt terms, a proven enemy to her physical well-being. The jury could consider that defendant was dangerous enough that the RFA court found that he presented a "danger of further abuse" and "a credible threat to [complainant's] physical safety." Knowing contact was unwanted, and his messaging unwelcomed, defendant insisted day after day after day in urging complainant to return to him. While, as the majority correctly notes, none of his texts were profane, explicitly threatening or violent, defendant texted complainant as though there was no history of abuse, no risk to complainant, and as if it was she who was responsible for their separation.

¶ 51. It is established, and no surprise, that abused women are most at risk when they leave their abusers. S. Gold, *Why Are Victims of Domestic Violence Still Dying at the Hands of Their Abusers? Filling the Gap in State Domestic Violence Gun Laws*, 91 Ky. L.J. 935, 940 (2003). Anyone afraid to the point of taking out an RFA no-contact order against an abuser could rationally be annoyed, irritated, tormented and alarmed by the abuser's refusal to accept the end of their relationship or credit the victim's explicit desire not to be with him, and the abuser's unabashed persistence in seeking to be with the victim again while pretending nothing was wrong between them but her RFA order. It is also just as likely from the evidence that, as complainant's abuser, defendant appreciated that his deliberate, persistent and unwanted attentions would be annoying to the point of being prohibited by the order as harassment. All of this was evinced by the jury's unanimous conclusion that a reasonable person in complainant's situation would have found defendant's actions harassing. Literature and cinema, like real life reflected by this defendant's actions, are replete with serial ruffians who are neither profane nor

expressly threatening,[10] but the majority offers no particular explanation on this record —. aside from defendant's ostensible politeness — of why a person in complainant's circumstance would *not* feel harassed by the unrelenting and unwanted attention of her assaulter.[11]

¶ 52. The stalking statute invoked by the majority is inapposite. Importation of the stalking definition of harassment, not called for by the Legislature and previously rejected by this Court in *Goyette*, is unnecessary to put an RFA defendant on notice as to what is prohibited. The family court is authorized to issue orders against domestic abuse and, by plain implication, against harassing conduct by household members. See 15 V.S.A. § 1103(c)(1) (authorizing the court to "make such orders as it deems necessary to protect the plaintiff"); *Goyette*, 166 Vt. at 302, 691 A.2d at 1066 (upholding validity of a no-harassment condition as not "beyond the scope of the conduct the abuse-prevention statute seeks to deter"). The *Goyette* Court also declined an invitation to limit the definition of harassment in RFA orders by adding emotional distress and lack-of-legitimate-purpose elements from the criminal stalking statute because a "definition of harassment could conceivably vary depending on the circumstances of individual [RFA] cases." *Id.* at 304, 691 A.2d at 1067.

¶ 53. Grafting an unnecessarily narrow and foreign statutory stalking definition to the no-harassment condition in the RFA order is at odds with the order's intent and contravenes the general purpose of the abuse-prevention statute. Predicated on abuse, RFA orders are designed to prevent further abuse. In setting the bounds of such an order, the court is not limited to preventing already illegal conduct, but can prohibit "otherwise legitimate conduct" that can be harassing in an abusive relation-

[10] Robert Mitchum's portrayal of the smarmy, but dangerous, Harry Powell in "Night of the Hunter" (Paul Gregory Productions, 1955) is exemplary, with the film adapted from Davis Grubb's 1953 best-selling novel by the same name based, in turn, on actual domestic-violence incidents of gothic proportion.

[11] Further, and contrary to defendant's assertion, the condition was not invalid even if he was not personally aware his conduct would violate the order. In a prosecution for violation of an RFA, the State need "prove only that defendant violated the order after it was properly served upon him." *State v. Crown*, 169 Vt. 547, 549, 726 A.2d 493, 495 (1999) (mem.). The State need not prove defendant subjectively knew his conduct violated the order. *Id.* (declining to hold that a charge of first offense violation of an RFA under 13 V.S.A. § 1030(a) calls for proof that defendant understood the requirements of the abuse-prevention order).

ship. *Id.* at 302, 691 A.2d at 1066. Accordingly, this Court has confirmed that the RFA court's authority extends to restraining an abuser's liberty to engage in harassment beyond the more strict definitions outlined in the anti-stalking statute. *Id.* at 303-04, 691 A.2d at 1067; see also *Hinchliffe*, 2009 VT 111, ¶ 25 (explaining that context of past events important to determining whether victim had an objectively reasonable fear of bodily injury from defendant's actions).

¶ 54. The RFA order as *applied* in this case does not, as posited by the majority, need a narrower, "best available" redefinition of harassment. *Ante*, ¶ 31. Protective orders need not anticipate and specifically prohibit each and every tactic within the ingenuity of abusers to deliberately annoy and harass their victims. Common sense and a jury are equipped to judge that various behaviors under particular surrounding circumstances are, or are not, objectively harassing. For example, an ordinarily celebratory bouquet of lilies can be reasonably expected to presage a funeral when sent by one who beats and threatens to kill you; just as a teddy-gram can obviously trigger discomfort if one has been suffocated by the sender with a stuffed animal. Whether such abusive effects are intended or reasonably expected are well within the objective experience of both an abuser and a jury.

¶ 55. The majority's urge to otherwise limit the meaning of harassment is equally unfounded. Harassment, in its ordinary sense, is not necessarily threatening. Contrary to the majority's reading, *ante*, ¶ 27, the order that defendant not "threaten *or* harass" complainant expressly indicates two different kinds of misconduct and that both were prohibited. (Emphasis added.) The stalking statute's specialized definition of harassment, some one-hundred chapters removed from and not in pari materia to the RFA statutory scheme, is far from the commonly understood meaning of the term. Cf., e.g., Webster's New Collegiate Dictionary 517 (1981) (defining harass as "to annoy persistently"); Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/harass (defining harass as "(1) to annoy persistently (2) to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct"). Importation of the criminal stalking standards is also plainly at odds with the RFA purpose to deter future abuse by prohibiting "otherwise legitimate conduct." *Goyette*, 166 Vt. at 302, 691 A.2d at 1066. Plaintiff was entitled to protection against

annoyance directly arising from her abuse by defendant. Moreover, the majority's narrow redefinition of harassment to require a threat of rape, kidnapping, injury or death, 13 V.S.A. § 1061(4), would exclude telephoning a victim repeatedly at 3:00 in the morning or disseminating intimate photographs of a victim, as well as breaking windows, cutting cables and slashing tires — not uncommon responses to RFA orders.

¶ 56. The rule of lenity is no impediment to the State's charge or the sufficiency of the trial court's instruction because there was no ambiguity in the criminal statute to resolve. The criminal statute is clear, providing in pertinent part that a "person who commits an act prohibited by a court . . . after the person has been served notice of the contents of the [RFA] order . . . shall be imprisoned." 13 V.S.A. § 1030(a). The court's order that defendant "shall not threaten or harass plaintiff" informed him that threats and harassment are separate acts and that harassment need not include a threat. The notion of annoyance being actionable as harassment was limited by the particular context as applied to an abuser ceaselessly soliciting his victim against her wishes. Thus, the court instructed that the jury had to find a persistent and intentional action directed at complainant, and that it was objectively reasonable for her to view such messaging as harassment. The jury's determination, in accordance with the trial court's instruction, that defendant's intentional course of conduct "would cause a reasonable person to be annoyed, irritated, tormented or alarmed" confirms there was neither objective ambiguity in the order, nor any objective risk of confusion on defendant's part to warrant the majority's lenity in construing the RFA order.[12]

¶ 57. It was settled, when the instruction was given, that no fixed definition of harassment was mandated and that harassment could vary according to the circumstances of the RFA case. See *Goyette*, 166 Vt. at 304, 691 A.2d at 1067 (acknowledging that definition of harassment can vary depending on facts of particular case). Neither the law nor the facts here suggested that harassment must exclude persistent, deliberate and objectively annoying conduct directed against domestic-abuse victims, let alone be

[12] If the jury "struggled" with the definition supplied by the court, as argued by the majority, *ante,* ¶ 33, its puzzlement was unanimously resolved within minutes of the court's reiteration, without elaboration, that the common definition would govern.

limited by the extraneous stalking statute. Neither law nor logic limited actionable harassment to only threats of physical harm or kidnapping as discovered by the majority today. What the majority sees as error was not error and, even assuming error, it was not at all obvious or glaring, and so was not plain error. The record reflects no miscarriage of justice by way of the instructions and no prejudice to defendant when the definition is considered in the context of his domestic violence as evident to the jury. Without plain error, the conviction cannot be reversed and should be affirmed.

¶ 58. I am authorized to state that Chief Justice Reiber joins this dissent.