2013 VT 109



State v. Waters (2011-319)

 

2013 VT 109

 

[Filed 15-Nov-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to notify
the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at:
Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any
errors in order that corrections may be made before this opinion goes to press.

 

 


 2013 VT 109
 
  


 No. 2011-319
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Windham Unit,
 
 
  
 
 
 Criminal Division
 
 
  
 
 
  
 
 
 Tyler Smith Waters
 
 
 October Term, 2012
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 David
 Suntag, J.
 
 
  
 
 Ashley A. Harriman, Windham County Deputy State’s Attorney
and Robert D. Lees, Law Clerk 

  (On the Brief), Brattleboro, and Evan P. Meenan, Assistant Attorney General, Montpelier, for

  Plaintiff-Appellee.

 

Matthew F. Valerio,
Defender General, and Dawn Matthews, Montpelier, for Defendant-Appellant.

 

 

PRESENT:  Reiber, C.J., Dooley, Skoglund,
Burgess and Robinson, JJ.

 

 

¶ 1.            
ROBINSON, J.   This case calls upon us to determine
whether it was plain error  to instruct a jury that it could convict
defendant for violating an abuse-prevention order prohibiting him from
harassing petitioner if it concluded that he engaged in conduct that would
cause a reasonable person to be “annoyed, irritated, tormented or
alarmed.”  We conclude that the instruction was plain error, and that the
evidence below could not support a conviction for violating the
abuse-prevention order, as worded.  We accordingly reverse, and remand for
entry of a judgment of acquittal.  

¶ 2.            
Complainant and defendant Tyler Waters lived together for several years
and have a minor child together.  In 2009, after they broke up,
complainant got a relief-from-abuse (RFA) order against defendant.  For
various reasons, the terms of the order were modified more than once.  The
October 2009 modified final RFA order was based on findings that defendant had
abused complainant, there was a danger of further abuse, and defendant
represented a credible threat to complainant’s safety.  The order
prohibited defendant from, among other things, abusing, threatening, stalking,
or harassing complainant.  It prohibited defendant from communicating or
attempting to communicate directly or indirectly with complainant, except
that it specifically stated, “[d]efendant may have contact
by telephone only.”  The order placed no limitation on the frequency,
timing, or subject matter of telephone contact.[1]  

¶ 3.            
The court did not make any findings that defendant had abused the
then-two-year-old child, or that defendant posed any threat to the child’s
safety.  It authorized defendant to have telephone contact with the child
on Friday evenings, and provided for weekly contact between defendant and the
child at a specified visitation center in accordance with center rules and
regulations.

¶ 4.            
In December 2009, complainant reported to the police that due to the
volume of communications from defendant she felt “harassed, bullied, and made
to feel guilty.”  Complainant told police that defendant had sent her
around forty text messages in a one-month period and had called her over thirty
times.  

¶ 5.            
The State charged defendant with violating the RFA order; in particular,
the State alleged that defendant had violated the prohibition against harassing
complainant.  Because defendant had previously been convicted of violating
an RFA order, this was a second offense, and defendant was subject to up to
three years imprisonment, a fine of $25,000, or both.  13
V.S.A. § 1030(b).

¶ 6.            
Before the trial started, the court distributed proposed jury
instructions to the parties.  Both the State and defendant agreed with the
court’s proposed instruction on harassment.  Accordingly, in its pretrial
instructions to the jury, the court defined harassment as follows:

To
harass another person means to intentionally engage in a course of conduct
directed at that person which would cause a reasonable
person to be annoyed, irritated, tormented, or alarmed.  The conduct might
consist of words, gestures, offensive touching, telephone calls, text messages,
or other acts.  In this context harassment required proof of active or
intentional participation by [defendant].  The mere fact that
[complainant] may have been bothered by or that she disagreed with defendant’s
actions is not enough by itself to show that [defendant] is guilty of
harassment.  Also, the word harassment means that defendant’s conduct was
persistent.  A single inadvertent incident is not harassment, whereas persistent,
repeated, annoying conduct directed at another person may be found to be
harassment.  

 

¶ 7.            
At trial, complainant read aloud each of defendant’s texts and explained
the context.  Some texts simply related to defendant’s weekly telephone
call or his weekly visit with the child, or other nuts-and-bolts matters. 
For example, he texted, “[g]rab stuff if you want
later,” apparently in reference to the clothes complainant had left at
defendant’s house.  In other texts, defendant suggested meetings or
outings with complainant and the child even though the RFA order did not allow
defendant other-than-telephone contact with complainant.  For example,
defendant texted: “Lunch or dinner?  Am bored. 
Hope you feel better.  Can watch [the child] or fetch something if you
need.  Hi, [child’s name].  Let’s check Okemo
out.”  

¶ 8.            
In many texts, defendant made overtures to reestablish his relationship
with complainant or expressed his loneliness or longing to reconcile.  For
example, defendant texted: “Hi.  Getting in. 
It’s after work.  Call me.  Not sure what phone you got.  I love
you two.  Wish to end no-contact soon.  Let’s be more normal. 
No more courts and such.  What you think?”  Another time he wrote:
“Have not any better friend than u.  All alone all the
time.  Wish wuz with u 2.  Call me
if you need.  Till Fri.”

¶ 9.            
Many if not most texts wove together two or more of these threads. 
For example, the day before a scheduled visit with the
child, defendant texted: “Got few minutes if you wanted to call.  If not,
okay.  I wish we could get together.  Miss you two way too
much.  All I think about.  Sorry to bother you.  Sneakers on [the child] tomorrow.  Love you.” 
And, finally, defendant appears to have sent some texts in response to messages
from complainant.  For example, one text began with the words, “[t]hat is
awesome,” and was apparently a response to complainant’s instruction that he
could bring snow pants to the next day’s visit.

¶ 10.         All
told, the State presented evidence of approximately thirty-seven text messages
from defendant to complainant spanning approximately a thirty-seven-day
period.  The average rate of messaging during this period was one per day,
although, in fact, many of the text messages were clustered in clumps around
events or interactions, so often several days (ranging from two to five) passed
between text communications.  Defendant did not threaten harm to any
person or property in any of the texts, and none of the texts contained
language that was profane, threatening, intimidating, or violent.  

¶ 11.         The
complainant testified that the texts were unwelcome, and that she did not think
defendant was supposed to be communicating with her.  She said, “I believe
there were a couple of phone calls that occurred that I know there were a few
times where we spoke together—where I believe in these phone calls I actually
asked him to stop—stop constantly texting me and calling, . . .
the way I understood was he wasn’t supposed to be talking to me.”  There
was no evidence as to when complainant made these requests.[2] 

¶ 12.         At
the close of the State’s case, defendant moved for a judgment of
acquittal.  Defendant argued that thirty-seven texts over a one-month
period is not something a reasonable person would find harassing. 
Defendant claimed that he had not intentionally acted to harass and there was
no evidence to demonstrate that a reasonable person would find his messages harassing. 
Defendant claimed that even the complainant described the behavior as
irritating rather than annoying.  The court denied the motion, concluding
that a reasonable person could be annoyed or tormented by repeated requests
from a prior abuser for face-to-face contact in contravention of an RFA order.
 Defendant did not testify, and the case was submitted to the jury.  

¶ 13.         In
the jury charge, the court repeated the substance of its pretrial instruction
including its explanation that to harass a person “means to intentionally
engage in a course of conduct directed at that person which would cause a
reasonable person to be annoyed, irritated, tormented, or alarmed.” 
Defendant did not object to the court’s instruction.

¶ 14.         During
its deliberations, the jury submitted a question to the judge asking if there
was a legal definition of “tormented” and “annoyed.”  The court responded
that there was no further legal definition and instructed the jury to apply the
“common definitions.”  The jury returned a guilty verdict, and defendant
filed a timely notice of appeal.

¶ 15.         On
appeal, defendant argues that the court’s jury instruction on harassment was
overly broad, and that the evidence of harassment in this case was insufficient
to convict defendant of violating the abuse-prevention order.

¶ 16.         We
begin with defendant’s challenge to the jury instruction.  Because
defendant did not object to the court’s jury instructions at trial, our review
on appeal is limited to plain error.  See V.R.Cr.P.
52(b); In re Carter, 2004 VT 21, ¶ 21, 176 Vt. 322, 848 A.2d 281
(“Since petitioner failed to object to the jury instructions, he must show
plain error.”).  Plain error review of jury instructions assesses the
instructions as a whole “to determine if they breathe the true spirit of the
law, and if there is no fair ground to say that the jury has been
misled.”  State v. Rounds, 2011 VT 39, ¶ 22, 189 Vt. 447, 22
A.3d 477 (quotation omitted).  A claim of error only rises to the level of
“plain error” if (1) there is an error; (2) the error is obvious; (3) the error
affects substantial rights and results in prejudice to the defendant; and (4)
the error seriously affects the fairness, integrity or public reputation of
judicial proceedings.  State v. Herrick, 2011 VT 94, ¶ 18, 190
Vt. 292, 30 A.3d 1285.

¶ 17.         We
note at the outset what this case is and is not about.  This case is not
about whether an abuse-prevention order can prohibit the type of conduct
defendant undisputedly engaged in here.  Vermont’s abuse-prevention
statute specifically provides that an RFA order may include: 

an
order that the defendant refrain from abusing the plaintiff, his or her
children, or both and from interfering with their personal liberty, including
restrictions on the defendant’s ability to contact the plaintiff or the
children in person, by phone, or by mail and restrictions prohibiting the
defendant from coming within a fixed distance of the plaintiff, the children,
the plaintiff’s residence, or other designated locations where the plaintiff or
children are likely to spend time.

 

15 V.S.A. § 1103(c)(2)(A).  There is no question that an RFA order can
prohibit conduct such as defendant’s serial texting of complainant, and that
the State can criminally prosecute individuals who violate such
prohibitions.  See Benson v. Muscari, 172
Vt. 1, 4, 769 A.2d 1291, 1294 (2001) (acknowledging that provisions in RFA
order may “prohibit what otherwise may be viewed as inoffensive contact before
it matures into further incidents of abuse”); State v. Goyette,
166 Vt. 299, 302, 691 A.2d 1064, 1066 (1997)
(“[A] relief-from-abuse order may prohibit otherwise legitimate conduct to
prevent future abuse, and that conduct may serve as the basis of a criminal conviction
for violating the order.”).  

¶ 18.         Had
the RFA order in this case prohibited defendant from contacting complainant by
telephone, or limited the subject matter of his communications solely to
arrangements concerning scheduled telephone calls, visits with the parties’
child, or communications necessary to protect the child’s well-being, this
would have been an open-and-shut case.  But the State does not suggest
that the frequency or subject matter of defendant’s text messages ran afoul of
any specific limitations on defendant’s contact with complainant other than the
prohibition against harassment.  The law can only punish defendant
“because he violated the conditions imposed upon him, [not] because he violated
the conditions that hindsight shows should have been imposed upon him.”  State v. Danaher, 174 Vt. 591, 595, 819 A.2d 691, 696 (2002)
(mem.) (Dooley, J., dissenting). 
Accordingly, the central question in this case is whether the RFA order
actually issued in this case sufficiently notified defendant that he could be
convicted for violating the order’s prohibition on harassment on the basis of
his text messages if a jury concluded that the messages “would cause a
reasonable person to be annoyed, irritated, tormented, or alarmed.”   

¶ 19.         In
order to answer this question, we have to determine what “harassment” means in
the context of an RFA order when it is not otherwise defined. 
Given the consequences of violating an RFA order—including criminal prosecution
and a sentence of imprisonment—in construing the order, we must ensure that a
defendant has notice “of what circumstances will constitute a violation.” 
See State v. Sanville, 2011
VT 34, ¶ 8, 189 Vt. 626, 22 A.3d 450 (mem.)
(discussing requirement that probation order provide clear
notice of what conduct will violate the order).  “Due process requires
that such notice inform him as to what acts may constitute a violation of [the
order], thereby subjecting him to loss of liberty.”  Id.
(quotations omitted); see also State v. Frechette,
161 Vt. 233, 235-36, 637 A.2d 1080, 1082 (1993) (“To be enforceable, criminal
statutes . . . must define a criminal offense with sufficient
certainty so as to inform a person of ordinary intelligence of conduct which is
proscribed, and such that arbitrary and discriminatory enforcement is not
encouraged.” (quotations omitted)).

¶ 20.         Vermont’s
abuse-prevention statutes do not even mention, let alone define, the term
“harassment.”  See 15 V.S.A. §§ 1101-1115.  However, the
standard RFA form order used in the family division includes a check-box that
allows the court to order that “[d]efendant shall not
threaten or harass” the plaintiff and/or minor children.  The form order
likewise does not define the term.

¶ 21.         We
have previously determined that conduct must do more than subjectively bother
another person in order to violate the prohibition of harassment in RFA
orders.  Goyette, 166 Vt. at 303, 691 A.2d at 1067.  In Goyette
we considered a violation-of-an-abuse-prevention-order (VAPO) conviction
arising from a series of actions by the defendant subject to an RFA order
containing a “no harassment” condition.  The trial court’s instruction
defined harassment as “to engage in repeated acts which trouble, worry,
torment, disturb or threaten another.”  Id.  Concluding that
“the court’s broad definition of harassment permitted defendant to be convicted
on the basis of virtually any
behavior that bothered the complainant,” we reversed the conviction.  Id.
at 304, 691 A.2d at 1067.  

¶ 22.         Although we determined that the described
conduct did not rise to the level of harassment, we did not lay out
exactly what does qualify as harassment in the context of RFA
orders.  We declined the defendant’s request to define harassment to
require “that the alleged acts were committed for no legitimate purpose and
caused the complainant emotional distress,” noting in passing that “[a]
definition of harassment could conceivably vary depending on the circumstances
of individual cases.” [3] 
Id.

¶ 23.         This
case calls upon us to answer the question we left open in Goyette. 
As we suggested in Goyette, the question of
whether particular conduct constitutes harassment may be very context
dependent.  Seemingly innocuous statements or conduct may take on very
different meaning when understood against the backdrop of a history of violence
or threats of violence.  See also State v. Hinchliffe,
2009 VT 111, ¶ 25, 186 Vt. 487, 987 A.2d 988 (explaining that context of
past events is important to determining whether victim had objectively
reasonable fear of bodily injury from defendant’s actions).  But the
definition of harassment itself cannot be a moving target if the standard
provision in the family division RFA order is to provide fair notice to
defendants and a fair basis for prosecuting them for violating those orders.

¶ 24.         In
trying to determine the appropriate definition of “harassment” in this context,
we are struck by the widely divergent definitions and understandings of the
term in various contexts. Vermont’s stalking statute is the only provision in
Vermont’s criminal laws that purports to define the term.[4]  That statute provides:  

“Harassing”
means actions directed at a specific person, or a member of the person’s
family, which would cause a reasonable person to fear unlawful sexual conduct,
unlawful restraint, bodily injury, or death, including but not limited to
verbal threats, written, telephonic, or other electronically communicated
threats, vandalism, or physical contact without consent.

 

13 V.S.A.
§ 1061(4).  The statute prohibiting disturbing the peace by
electronic communication does not define harassment, but states that “[a]n
intent to terrify, threaten, harass or annoy may be inferred by the trier of fact from the use of obscene, lewd, lascivious or
indecent language or the making of a threat or statement or repeated anonymous
telephone calls or other electronic communications.”  Id.
§ 1027(b).[5]

¶ 25.         Vermont’s
civil statutes use the term “harass” very differently.  See, e.g., 16
V.S.A. § 11(a)(26) (defining “harassment” as “incident or incidents of
verbal, written, visual, or physical conduct, including any incident conducted
by electronic means . . . that has the purpose or effect of
objectively and substantially undermining and detracting from or interfering
with a student’s educational performance or access to school resources or
creating an objectively intimidating, hostile, or offensive environment”); Washington
v. Pierce, 2005 VT 125, ¶ 3, 179 Vt. 318, 895 A.2d 173 (requiring, as
a prerequisite for a claim under Vermont’s Public Accommodations Act, that the
harassing conduct be “so severe, pervasive, and objectively offensive that it
can be said to deprive the victims of access to the educational opportunities
or benefits provided by the school” (quotation omitted)).[6]

¶ 26.         In
ordinary usage, the term tends to have an overlapping but different set of
meanings.  See, e.g., Random House Unabridged Dictionary 870 (2d ed. 1993)
(defining “harass” as “1. to disturb persistently;
torment, as with troubles or cares; bother continually; pester; persecute. 2.
to trouble by repeated attacks, incursions, etc., as in war or hostilities;
harry; raid”); see also Black’s Law Dictionary 733 (8th ed. 2004)
(defining harassment as “[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at
a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate
purpose”). 

¶ 27.         We
conclude that, in the absence of any elaboration in the RFA order regarding the
intended definition of “harassment” or the type of conduct prohibited, the most
appropriate touchstone for defining the term in the context of a VAPO
prosecution is the definition in Vermont’s stalking statute.  We reach
this conclusion for several reasons.  First,
just as “ambiguity concerning the ambit of criminal statutes should be resolved
in favor of lenity,” a prohibition in an abuse-prevention order, the violation
of which can be the basis for a criminal prosecution, should be construed
against the State when it is susceptible of varying reasonable
interpretations.  Jones v. United States, 529
U.S. 848, 858 (2000) (quotation omitted). 
Given the multiplicity of meanings associated with the term “harassment,” the
more restrictive definition reflected in a related statute in Vermont’s
criminal code is a more appropriate guideline than the extremely broad,
everyday usage of the term, which can reach a wide range of bothersome but not
necessarily threatening activity.

¶ 28.         Second,
the purposes of the stalking statute and the RFA statute are aligned; both
concern themselves with threatening or violent behavior.  The extensive
limitations on a defendant’s conduct available through an RFA, and the powerful
enforcement tool of criminal prosecution that is available to enforce an RFA,
are warranted to combat the serious harm that domestic violence inflicts on
individuals, families, and our society more broadly.  We see no evidence
that the Legislature passed the statute to criminalize annoying or bothersome
conduct.  This is not to say that an RFA cannot prohibit annoying or
bothersome conduct.  As noted above, it can—not because such conduct is
itself the target of the statute, but because in the context of domestic
violence, such conduct may “mature[] into further
incidents of abuse.”  Benson, 172 Vt. at 4, 769
A.2d at 1294.  But, given the purposes of the statutes relating to
domestic violence, we are not inclined to infer that annoying conduct violates
an RFA order in the absence of a more specific statement in the order to that
effect.

¶ 29.         Third,
the order in this case says that “defendant shall not threaten or harass
[complainant].”  The joining of “threaten” and “harass” in a single
prohibition supports the inference that the two concepts are closely
related.  “Threaten” and “annoy” are different enough concepts that they
would not likely share a check-box on the RFA form order.  Moreover, this
understanding of the meaning of harassment fits better with the litany of other
acts prohibited in the order, including threats, stalking, interference with
liberty, use of physical force reasonably expected to cause bodily injury,
abuse, and acts that create reasonable fear of bodily injury.  “Annoying”
acts are out of synch with the rest of this list.  

¶ 30.         We
recognize that our construction of the term gives rise to redundancy; but the
RFA order itself is rife with redundancy.  It prohibits threats, as well
as actions that would place the plaintiff “in reasonable fear of bodily
injury,” as well as stalking—which itself is characterized by threatening
conduct.  This being a standardized court order rather than a statute
passed by the Legislature, we are not compelled to ascribe a nonredundant meaning to every term.  If anything, the
form uses overlapping terms and categories to ensure that defendants understand
their obligations.

¶ 31.         We
emphasize the limits of our holding.  The definition of “harass” in the
stalking statute may well be overly narrow in the context of an RFA order, and
a court is free to prohibit a defendant from having any contact with a
petitioner, or to specifically restrict the mode, substance, and timing of any
permitted contact.  But, in the absence of a definition of the term in the
statutes relating to domestic violence, or a more specific definition in the
RFA order itself, the stalking statute offers the best available legal
definition to inform our interpretation of this RFA order.  For all the
reasons persuasively highlighted by the dissent, an RFA order certainly can,
and in many cases should, proscribe the kind of conduct engaged in by defendant
in this case—conduct that is not unlawful in its own right or even necessarily
threatening, but which in the context of a relationship characterized by
domestic violence takes on a different significance.  However, in the
absence of more specific guidance in an RFA order, or from the Legislature, we
construe harassment to mean: 

actions directed at a specific person, or a member of the
person’s family, which would cause a reasonable person to fear unlawful sexual
conduct, unlawful restraint, bodily injury, or death, including but not limited
to verbal threats, written, telephonic, or other electronically communicated
threats, vandalism, or physical contact without consent.

 

13 V.S.A.
§ 1061(4).  Accordingly, we conclude that the trial court’s
instruction was erroneous.

¶ 32.         We
further conclude that the error is sufficiently clear to amount to plain
error.  The trial court did its best to come up with an instruction to
fill the gap this Court left open in Goyette. 
Unaided by a timely objection, it cannot be faulted for adopting a definition
of “harassment” that is consistent with some colloquial uses of the term. 
However, given the considerations outlined above, including the wide range of
legal and everyday uses of the term and the due-process-infused rule of lenity,
we conclude that the instruction that allowed the jury to convict defendant on
the basis of objectively annoying conduct was clearly error. 

¶ 33.         We
further conclude that defendant was significantly prejudiced by the
instruction.  The State does not deny that the RFA order expressly allowed
defendant to have telephone contact with complainant without express
restrictions as to frequency, timing, or content.  The State has not
alleged that defendant’s messages included threatening, menacing, offensive, or
lewd content, or that the messages would cause a reasonable person—including a
reasonable person with full knowledge and experience of defendant’s past
abusive conduct—to fear the kinds of harms listed above.  As the State
acknowledged in its closing argument, “the real question is, did he harass her;
was his behavior in that time period . . . harassment.” 
The State’s case, and defendant’s conviction, rested squarely on the overly
broad definition of harassment used in the trial court’s jury
instructions.  That the jury itself struggled to understand the boundaries
of the term “harassment” is evident from the questions it asked the court
during its deliberations.  If the jury instructions had defined harassment
consistent with the default definition identified above—one that requires an
element of threat—we conclude that the jury could not have convicted defendant
on this evidence.  

¶ 34.         We
recognize that defendant’s repeated texts to petitioner were insensitive. 
She would have been entitled to ask the court to modify its order to expressly
restrict defendant’s text messages to her as to timing, frequency, manner, content,
or other parameters.  She could have asked the court to prohibit direct
contact altogether, substituting an alternate method of arranging for
parent-child contact.  Against the backdrop of defendant’s prior abuse of
her, such limitations would have been entirely appropriate.  But we cannot
say that the communications amounted to threats.  The State relies
primarily on the frequency of defendant’s communications to support its
charge.  In the face of an order permitting telephone contact without
restriction as to frequency, timing, or subject matter, the frequency of
defendant’s texts by itself cannot support an inference that the conduct was
threatening.  In this day and age, one text per day, on average, is not a
shocking number, especially given the lack of clear evidence that complainant
asked defendant to stop texting her before he sent many of those texts. 
As of spring 2011, 18-29 year-old cell-phone owners send and receive text
messages at an average rate of 87.7 messages a day, and 95% of this age group use the text messaging feature on their phones.  Aaron Smith, Pew Inst., Americans and Text Messaging 3
(2011), http://pewinternet.org/~/media//Files/Reports/2011/Americans%20and
%20Text%20Messaging.pdf.

¶ 35.         Given
that we conclude that a jury instructed about the definition of “harassment” in
the RFA order in a way that is consistent with this opinion could not convict
defendant of violating the abuse-prevention order on the basis of the evidence
presented below, convicting defendant of a felony on the basis of an overly
broad instruction would undermine the fairness of the judicial process.

Defendant’s conviction is
reversed and the matter is remanded for entry of a judgment of acquittal.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  

 

¶
36.        
DOOLEY, J., concurring.   I
fully join the majority opinion.  Based on the language of the
relief-from-abuse (RFA) order, the relevant law, and the fact that the language
of the form order amounts to a definition of a crime when the order is
violated, I concur that we should derive the definition of harassment from the
stalking statute.  I write to suggest a solution to definitional
difficulties like the one before us.

¶
37.        
I have attached to this concurrence the relevant part of the redacted
RFA order from this case.  The part in issue consists of a checked box
next to the following text: “Defendant shall not threaten or harass,” which is
followed by another checked box and “Plaintiff.”  The order, like
virtually all RFA orders, is entered on Judiciary Form 152-F.  While I
have not done a study, my sense is that this language has been on the RFA form
since 15 V.S.A. § 1103 was passed.  15 V.S.A. § 1103(c)(1), (2).  While judges are not required to check any
box on the form, this box is routinely checked.  As the majority decision
points out, the statute requires the court to “make such orders as it deems
necessary,” and specifically orders certain terms, but does not mention the
term “harass.”  Id.  Thus, this standard form term was created
by the judiciary.

¶
38.        
Form orders have advantages in routinizing
court action and ensuring that findings are made and order provisions are
considered.  They tend, however, to create inertia in the process. 
It is apparent from the prior decisions relied upon by the majority and the
dissent in this case that the term “harass” is vague in this context and has
for some time been in need of definition or modification, especially since it
becomes the description of a crime where an RFA order prohibiting such is
violated.  A reconsideration of the form—either by adding a definition to
the term “harass” or using a different term—is preferable to a case-by-case
review process that enmeshes parties in unnecessary litigation and rarely
solves the language deficiency prospectively.

¶
39.        
There is a second deficiency in the case-by-case approach which is
apparent from this case.  I have joined the majority because the decision
finds and applies the most appropriate construction of “harass” under the
circumstances.  In doing so, I am not satisfied that the result leaves us
with the optimal terms in the RFA order.  Indeed, I would abandon the use
of the word “harass” in favor of other terminology or define it in the order in
a better way.  For me, the worst result is that we leave the standard
language as it is.  I hope the Family Division Oversight Committee will,
in the wake of this decision, modify or define the term in issue.

¶
40.        
This concurrence is also stimulated by the fact that the language
construction difficulties that are appearing in the context of RFA orders are
also present in other contexts—particularly conditions of probation and
conditions of pretrial release.  Again, I am referring to standard
conditions on standardized form orders.  I urge that we use the occasion
of this decision to revisit each of these form orders that contain optional
standard conditions or terms not required by law.  Such a review is a far
better way of addressing the language issues than more piecemeal litigation
like this. 


  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate Justice
 
  





 

¶ 41.         BURGESS,
J., dissenting.   It does not take a
linguist, a lawyer, or statutes from other states to know that persistently
texting your domestic-violence victim to get her within reach, after she has
obtained a relief-from-abuse (RFA) order against you and after being told your
hectoring is unwelcome, is “harassment” as defined by the trial court below in
common parlance.  The majority recites that complainant secured an RFA
order against defendant based on his abuse, the danger of further abuse and his
credible threat to complainant’s safety, ante, ¶ 2, but then
recounts his pressure on her to resume their relationship as if these overtures
were unrelated to the fact that he recently “caused” and “attempted to cause
[her] physical harm.”  The majority summarizes defendant’s actions as
thirty-seven texts in as many days politely expressing loneliness, love, best
friendship and desire to get back together, ante, ¶¶ 7-10, and
finds it insufficient to prove harassment.  To reach this conclusion, the
majority instantly redefines harassment to require nothing less than a threat
of bodily injury, unlawful restraint, rape or death.  The trial court’s
more mundane instruction, however, was not plainly erroneous, if error at all. 
The evidence in its entirety, including defendant’s abuse of complainant and
her testimony that she told him in more than one telephone call to “stop
constantly texting . . . and calling” because it caused her
stress,[7]
supports the charge that defendant harassed her in violation of the RFA order
beyond a reasonable doubt.  Accordingly, I respectfully dissent from
redefining harassment and reversing the jury’s guilty verdict. 

¶ 42.         Adjudged
a violent abuser and ordered to stay away from complainant, the evidence was
that defendant embarked on a text-messaging campaign to cajole her to return to
him—personal contact prohibited by the RFA order.  The parties had a child
and defendant was granted supervised visitation, and was also allowed telephone
contact.  As evidenced by the court’s order to stay away, defendant knew
complainant did not want personal contact with him and why.  Yet, he
repeatedly texted her not just about child visitation, but about: his “luv” for complainant; his desire to hug her, have lunch
with her, have dinner with her, go to California with her, to “patch this,”
meet her at various places, visit with her, have a quick visit, fetch things
for her, ski with her, sled with her, shop with her, bowl with her, and be
together; what she wanted for Christmas; his concern for her; him being a
“mess” and crying without her; that he wouldn’t “let [her] down”; whether she
had any ideas about what he should do; and missing her.  This was all interspersed
with how their separation “sucks,” that he wanted an end to “no contact,” was
“ready 4 change” and “real fam time,” and that he
wanted to be friendly.  In a separate message, defendant “regret[ed] past action,” said he was “working to be better” and
invited complainant “to do coun[seling] together.”  In yet
another, defendant hoped for a “family outing soon.”  Some of these texts
were as frequent as two or three times a day.  

¶ 43.         The
jury unanimously agreed that defendant’s texting violated the RFA order’s
prohibition against harassment as defined by the trial court.  This
definition, without objection from defendant, was that to harass another person
meant to “intentionally engage in a course of conduct directed at that person which would cause a reasonable person to be annoyed,
irritated, tormented, or alarmed.”  The court further instructed that
harassment required proof of intentional, persistent and repeated instances of
annoying conduct directed at another person, when a reasonable person under the
same circumstances would have been so annoyed, irritated, tormented or alarmed
by defendant’s actions.  There appears to be no dispute that defendant’s
deliberate, near-daily and multiple messaging could be found by the jury as
“intentional” and “persistent” conduct “directed” at complainant.[8]  

¶ 44.         Absent
objection to the balance of the instruction, this Court’s review is limited to
plain error only.  State v. Mead, 2012 VT 36, ¶ 41, 192 Vt. 1,
54 A.3d 485.  Plain error results when four
factors are met: there is legal error, the error is obvious, the error affects
substantial rights causing prejudice, and the error seriously affects the
fairness or integrity of the judicial process.  State v. Rounds,
2011 VT 39, ¶ 31, 189 Vt. 447, 22 A.3d 477.  We
look to the instructions as a whole and will reverse “only when the entire
charge undermines confidence in the verdict.”  State
v. Carpenter, 170 Vt. 371, 374-75, 749 A.2d 1137, 1139 (2000). 
Put another way, “[p]lain error can be found only in exceptional circumstances
where a failure to recognize error would result in a miscarriage of justice, or
where there is glaring error so grave and serious that it strikes at the very
heart of the defendant’s constitutional rights.”  State
v. Hoadley, 147 Vt. 49, 53, 512 A. 2d 879, 881
(1986).  

¶ 45.         Nothing
of that sort happened here.  The alleged error must be “viewed in
context.”  State v. Kinney, 2011 VT 74, ¶ 13, 190 Vt. 195, 27 A.3d 348.  Given the specifically described texting
behavior in the context of defendant’s abuse of complainant, and the resulting
RFA order, the court’s inclusion of “conduct which causes a reasonable person
to be annoyed” within its definition of “harassment” was no obvious error at
all.  Indeed, it was neither unconstitutionally overbroad nor inherently
unfair to hold defendant accountable, and criminally responsible, under the RFA
order for relentlessly and deliberately annoying his victim by pestering her by
text to return to him.

¶ 46.         Only
in the abstract can the majority opine that “annoying acts” can never, as a
matter of law, suffice for harassment prohibited by an RFA order.  Ante, ¶ 29.  Surely no one should be convicted
for mere annoyance lest we all be eventually prosecuted, but that is neither
the charge nor a remote danger here.  Whether there is fair notice that
annoyance can qualify as harassment must depend upon the context of the
circumstances in which the RFA was imposed.  See State v. Hinchliffe, 2009 VT 111, ¶¶ 25-26, 186 Vt. 487, 987
A.2d 988 (explaining that prior conduct and relationship with victim are
relevant to question of whether defendant’s actions would cause reasonable
person in victim’s position to be afraid).  As charged in conjunction with
the specific allegation set forth in the affidavit of probable cause, the jury
was not left to ponder if defendant was generally annoying.  Instead, the
jury was called on to measure the particular conduct of repeatedly seeking to rekindle
a relationship with his victim, and lamenting her instigation of their
separation vis-à-vis the history of his abuse and a family court order to stay
away from her.  It was properly left to the jury to decide if his
annoyance, by persisting that his domestic violence victim ski, shop, dine,
attend counseling and return to him, was objectively prohibited as harassment
by the RFA order.  Defendant retained no right to deliberately
annoy his domestic abuse victim when ordered not to, and no evidence suggests
he was intellectually challenged so as not to appreciate that annoying his
victim with persistent requests to return would be prohibited by the commonly
understood meaning of harassment.  See State v.
Danaher, 174 Vt. 591, 593-94, 819 A.2d 691, 695 (2002) (mem.)
(holding due process is satisfied where ordinary
language of probation condition would put reasonable person on notice of
conduct prohibited).

¶ 47.         What
the majority misstates as the holding of State v. Goyette,
166 Vt. 299, 691 A.2d 1064 (1997), is no more than dicta that fails to compel
the majority’s result.  Defendant and the majority liken this case to Goyette, where the trial court’s charge was
determined erroneous by defining harassment as “repeated acts which
trouble, worry, torment, disturb or threaten another (emphasis added)” but then
instructing that the jury could convict if it unanimously found the defendant
committed but one of six alleged acts.  Id. at
303, 691 A.2d at 1067 (quotations omitted).  This Court reversed on
appeal, but not, as suggested by the majority, because of an overbroad
definition of harassment, ante, ¶ 21, but
because of plain error in the instruction allowing a conviction based on a
single act, rather than the repeated acts required for the offense.  Goyette, 166 Vt. at 303, 691 A.2d
at 1067.  No such error occurred here.  Although unnecessary
to its holding, the Court added that the breadth of the harassment definition
was reversible error as potentially criminalizing “virtually any behavior [by
the defendant] that bothered the complainant” during an acrimonious
divorce.  Id. at 304, 691 A.2d at 1067. 
Defendant and the majority contend that the court’s instruction here was
similarly overbroad because it allowed the jury to convict on irritating or
annoying behavior that is less than criminal “harassment” elsewhere defined by
the Legislature in the unrelated criminal anti-stalking statute.[9]  

¶ 48.         The Goyette passage on over-breadth, cited by defendant
and the majority, is not binding and is not persuasive.  Contrary to the
majority’s characterization, ante, ¶ 23, there was no question left open
in Goyette, because it is black letter law
that an instruction contradictory to the necessary elements of an offense—like
allowing a single instance to suffice for the necessary multiple instances—is
reversible error.  The Goyette court’s
comments on over-breadth were gratuitous, extraneous to its reversal for
failure to instruct on the element of repetitive misconduct, and devoid of
plain-error analysis.  The language relied on by the majority merely
assumed the instruction would allow conviction for harassment based on any
domestic disagreement whatsoever.  It does not explain why the State’s
particularized charge and evidence of defendant’s insults to complainant,
criticism of her love life, unwanted and uninvited interference with her
parental rights, and his threat to kill her, Goyette,
166 Vt. at 302-03, 691 A.2d at 1067, would not suffice for a violation of an
RFA order’s prohibition against harassment.  Whatever
unspecified and uncharged “disagreement between the parties” imagined as
overbroad in the second part of Goyette, id.
at 303, 691 A.2d at 1067, it was not an issue
in that case, and the Court’s supposed disposition on that ground is
immaterial, dicta, and not precedential. 

¶ 49.         Neither
“harassment” nor “annoyance” in the context of the RFA order and the specific
actions alleged in this case are concepts so esoteric, as posited by the
majority, as to require term-of-art refinements beyond the trial court’s
instructions.  By ninth grade, the difference between harmless impositions
and objectively bullying behavior is clear.  While the majority would
infantilize RFA defendants, the instant defendant need not have meditated long
over any quandary about the meaning of no-harassment—by simply following the
RFA order’s primary mandate to let complainant alone.  The jury here was
not, as feared by the majority, asked to judge if defendant was generally annoying
and irritating, but to determine if his unrequited texts of love and desire for
physical proximity, over and over again, to a victim of his violence who
explicitly did not want such contact, was annoying harassment prohibited by the
RFA order.  If defendant repeatedly texted his domestic violence victim
“wish wuz with u 2” and “luv
u” once, twice or thrice daily, after being served with a stay-away and
no-harassment RFA order, would it not be objectively annoying to the point of
harassment?  The majority says “no,” while the jury said “guilty.” 
Given the evidence and the real circumstances presented by the State in this
case, the jury’s verdict was supported, and the majority’s conclusion to the
contrary is not.   

¶ 50.         Left
for discussion, then, is the majority’s perception of defendant’s insistent
professions of need, “luv,” longing and fixation on
reunification as insufficiently concerning to harass complainant, a victim of
his past and threatened future domestic abuse and injury.  Omitted from the
majority’s equation is that defendant was not just a disaffected former
boyfriend, but was, boiled down to blunt terms, a proven enemy to her physical
well-being.  The jury could consider that defendant was dangerous enough
that the RFA court found that he presented a “danger of further abuse” and “a
credible threat to [complainant’s] physical safety.”  Knowing contact was
unwanted, and his messaging unwelcomed, defendant insisted day after day after
day in urging complainant to return to him.  While, as the majority
correctly notes, none of his texts were profane, explicitly threatening or
violent, defendant texted complainant as though there was no history of abuse,
no risk to complainant, and as if it was she who was responsible for their
separation.  

¶ 51.         It is
established, and no surprise, that abused women are most at risk when they
leave their abusers.  S. Gold, Why
are Victims of Domestic Violence Still Dying at the Hands of Their Abusers?
Filling the Gap in State Domestic Violence Gun Laws, 91 Ky. L.J. 935, 940
(2003).  Anyone afraid to the point of taking out an RFA no-contact order
against an abuser could rationally be annoyed, irritated, tormented and alarmed
by the abuser’s refusal to accept the end of their relationship or credit the victim’s
explicit desire not to be with him, and the abuser’s unabashed persistence in
seeking to be with the victim again while pretending nothing was wrong between
them but her RFA order.  It is also just as likely from the evidence that,
as complainant’s abuser, defendant appreciated that his deliberate, persistent
and unwanted attentions would be annoying to the point of being prohibited by
the order as harassment.  All of this was evinced by the jury’s unanimous
conclusion that a reasonable person in complainant’s situation would have found
defendant’s actions harassing.  Literature and cinema, like real life
reflected by this defendant’s actions, are replete with serial ruffians who are
neither profane nor expressly threatening,[10] but the majority offers no particular
explanation on this record—aside from defendant’s ostensible politeness—of why
a person in complainant’s circumstance would not feel harassed by the
unrelenting and unwanted attention of her assaulter.[11] 

¶ 52.         The
stalking statute invoked by the majority is inapposite.  Importation of
the stalking definition of harassment, not called for by the Legislature and
previously rejected by this Court in Goyette,
is unnecessary to put an RFA defendant on notice as to what is
prohibited.  The family court is authorized to issue orders against
domestic abuse and, by plain implication, against harassing conduct by
household members.  See 15 V.S.A. § 1103(c)(1)
(authorizing the court to “make such orders as it deems necessary to protect
the plaintiff”); Goyette, 166 Vt. at 302, 691
A.2d at 1066 (upholding validity of a no-harassment condition as not “beyond
the scope of the conduct the abuse-prevention statute seeks to deter”). 
The Goyette court also declined an invitation
to limit the definition of harassment in RFA orders by adding emotional
distress and lack-of-legitimate-purpose elements from the criminal stalking
statute because a “definition of harassment could conceivably vary depending on
the circumstances of individual [RFA] cases.”  Id. at 304, 691 A.2d at 1067. 

¶ 53.         Grafting
an unnecessarily narrow and foreign statutory stalking definition to the
no-harassment condition in the RFA order is at odds with the order’s intent and
contravenes the general purpose of the abuse-prevention statute. 
Predicated on abuse, RFA orders are designed to prevent further abuse.  In
setting the bounds of such an order, the court is not limited to preventing already
illegal conduct, but can prohibit “otherwise legitimate conduct” that can be
harassing in an abusive relationship.  Id. at 302, 691 A.2d at 1066.  Accordingly, this Court has
confirmed that the RFA court’s authority extends to restraining an abuser’s
liberty to engage in harassment beyond the more strict definitions outlined in
the anti-stalking statute.  Id. at 303-04, 691 A.2d at 1067; see
also Hinchliffe, 2009 VT 111, ¶ 25
(explaining that context of past events important to determining whether victim
had an objectively reasonable fear of bodily injury from defendant’s actions).

¶ 54.         The
RFA order as applied in this case does not, as posited by the majority,
need a narrower, “best available” redefinition of harassment.  Ante, ¶ 31.  Protective orders need not
anticipate and specifically prohibit each and every tactic within the ingenuity
of abusers to deliberately annoy and harass their victims.  Common sense
and a jury are equipped to judge that various behaviors under particular
surrounding circumstances are, or are not, objectively harassing.  For
example, an ordinarily celebratory bouquet of lilies can be reasonably expected
to presage a funeral when sent by one who beats and threatens to kill you; just
as a teddy-gram can obviously trigger discomfort if one has been suffocated by
the sender with a stuffed animal.  Whether such abusive effects are
intended or reasonably expected are well within the objective experience of
both an abuser and a jury.

¶ 55.         The
majority’s urge to otherwise limit the meaning of harassment is equally
unfounded.  Harassment, in its ordinary sense, is not necessarily
threatening.  Contrary to the majority’s reading, ante, ¶ 27, the
order that defendant not “threaten or harass”
complainant expressly indicates two different kinds of misconduct and that both
were prohibited.  (Emphasis added.)  The stalking statute’s
specialized definition of harassment, some one-hundred chapters removed from
and not in pari materia to
the RFA statutory scheme, is far from the commonly understood meaning of the
term.  Cf., e.g., Webster’s New Collegiate Dictionary 517 (1981) (defining
harass as “to annoy persistently”); Merriam-Webster Online Dictionary,
http://www.merriam-webster.com/dictionary/harass (defining harass as “(1) to
annoy persistently (2) to create an unpleasant or hostile situation for
especially by uninvited and unwelcome verbal or physical conduct”). 
Importation of the criminal stalking standards is also plainly at odds with the
RFA purpose to deter future abuse by prohibiting “otherwise legitimate
conduct.”  Goyette, 166 Vt. at 302, 691 A.2d at 1066.  Plaintiff was entitled to protection
against annoyance directly arising from her abuse by defendant.  Moreover,
the majority’s narrow redefinition of harassment to require a threat of rape,
kidnapping, injury or death, 13 V.S.A. § 1061(4), would exclude
telephoning a victim repeatedly at 3:00 in the morning or disseminating
intimate photographs of a victim, as well as breaking windows, cutting cables
and slashing tires—not uncommon responses to RFA orders.  

¶ 56.         The
rule of lenity is no impediment to the State’s charge or the sufficiency of the
trial court’s instruction because there was no ambiguity in the criminal
statute to resolve.  The criminal statute is clear, providing in pertinent
part that a “person who commits an act prohibited by a court . . . after
the person has been served notice of the contents of the [RFA]
order . . . shall be imprisoned.”  13
V.S.A. § 1030(a).  The court’s order that defendant “shall not
threaten or harass plaintiff” informed him that threats and harassment are
separate acts and that harassment need not include a threat.  The notion
of annoyance being actionable as harassment was limited by the particular
context as applied to an abuser ceaselessly soliciting his victim against her
wishes.  Thus, the court instructed that the jury had to find a persistent
and intentional action directed at complainant, and that it was objectively
reasonable for her to view such messaging as harassment.  The jury’s
determination, in accordance with the trial court’s instruction, that
defendant’s intentional course of conduct “would cause a reasonable person to
be annoyed, irritated, tormented or alarmed” confirms there was neither
objective ambiguity in the order, nor any objective risk of confusion on
defendant’s part to warrant the majority’s lenity in construing the RFA order.[12]  

¶ 57.         It
was settled, when the instruction was given, that no fixed definition of
harassment was mandated and that harassment could vary according to the
circumstances of the RFA case.  See Goyette,
166 Vt. at 304, 691 A.2d at 1067 (acknowledging that
definition of harassment can vary depending on facts of particular case). 
Neither the law nor the facts here suggested that harassment must exclude
persistent, deliberate and objectively annoying conduct directed against
domestic-abuse victims, let alone be limited by the extraneous stalking
statute.  Neither law nor logic limited actionable harassment to only
threats of physical harm or kidnapping as discovered by the majority
today.  What the majority sees as error was not error and, even assuming
error, it was not at all obvious or glaring, and so was not plain error. 
The record reflects no miscarriage of justice by way of the instructions and no
prejudice to defendant when the definition is considered in the context of his
domestic violence as evident to the jury.  Without plain error, the
conviction cannot be reversed and should be affirmed.

¶ 58.         I am
authorized to state that Chief Justice Reiber joins this dissent.


  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate Justice
 
  















[1]
 The State argues that the RFA order was modified to allow defendant to
contact complainant for the specific purpose of setting up weekly telephone
calls with the minor child.  While this may have been the purpose of the
allowed telephone contact, by its terms, the order did not limit defendant to
calling at a particular time, for a particular purpose, or for a limited number
of times.  Such limitations would have been useful in preventing the
unwanted contact in this case.  

 

We note that the order did not specifically
differentiate between telephone voice calls and text messages.  Because
the State has assumed that text messages were permitted by the order under the
general category of “contact by telephone,” we do not reach this
question.  Given the prevalence of communication via text messaging, it is
advisable in the future for the family division to specify in RFA orders
whether this type of contact is permitted or prohibited. 





[2]
 Although the State’s initial charge also referenced phone calls between
defendant and complainant, the evidence at trial focused almost exclusively on
the text messages.





[3] 
We subsequently declined to provide a specific definition of harassment for the
purpose of a VAPO action in State v. Premo,
168 Vt. 600, 719 A.2d 398 (1998) (mem.).  In
that case, the trial court had used the definition of harassment that appears
in Vermont’s stalking statute, and the State sought interlocutory appeal. 
The record was scant, the State had not offered any alternative definition of
its own, and the briefing was one-sided because the defendant had not filed a
brief.  Given these factors, we concluded that the case was not
appropriate for interlocutory review.  Id. at 600, 719 A.2d at 399. 





[4]
 Other provisions in Vermont’s criminal code use the term, but do not
specifically define it.  See, e.g., 13 V.S.A. § 352
(animal cruelty); id. § 1380 (financial exploitation); id.
§ 1456 (burning of religious symbols); id. § 5411a
(prohibiting harassment of individuals listed on sex offender registry); id.
§ 7554 (contacting witnesses while on pretrial release).

 





[5]
 Other states have adopted a variety of definitions of harassment in
stalking and harassment-prevention statutes.  See, e.g.,
Me. Rev. Stat. Ann. tit. 5, § 4651 (2012) (defining harassment to
mean:  “Three or more acts of intimidation, confrontation, physical force
or the threat of physical force directed against any person, family or business
that are made with the intention of causing fear, intimidation or damage to
personal property and that do in fact cause fear, intimidation or damage to
personal property”); Minn. Stat. Ann. § 609.748(a) (West 2012) (including
in definition of harassment, in addition to physical or sexual assault,
“repeated incidents of intrusive or unwanted acts, words, or gestures that have
a substantial adverse effect or are intended to have a substantial adverse
effect on the safety, security, or privacy of another”); N.C. Gen. Stat. Ann.
§ 14-277.3A(b)(2) (West 2008) (defining harassment as conduct “that torments,
terrorizes, or terrifies that person and that serves no legitimate purpose”);
Wash. Rev. Code Ann. § 10.14.020(2) (West 2011) (“ ‘Unlawful
harassment’ means a knowing and willful course of conduct directed at a
specific person which seriously alarms, annoys, harasses, or is detrimental to
such person, and which serves no legitimate or lawful purpose.  The course
of conduct shall be such as would cause a reasonable person to suffer
substantial emotional distress, and shall actually cause substantial emotional
distress to the petitioner . . . .”); Wis. Stat. Ann.
§ 813.125(b) (West 2012) (defining harassment to include, in addition to
threatening to or actually sexually assaulting, abusing, stalking, or
physically contacting, “[e]ngaging in a course of
conduct or repeatedly committing acts which harass or intimidate another person
and which serve no legitimate purpose”).

 





[6] 
See also 21 V.S.A. § 495d(13)
(defining sexual harassment in employment-discrimination context to mean
unwelcome sexual advances, requests for sexual favors, and other verbal or
physical conduct of  sexual nature that satisfies certain requirements).






[7] 
Even if the timing of the conversations in which complainant asked defendant to
stop constantly texting was not in evidence, as noted by the majority, ante,
¶ 11, the clear inference from the fact of more than one such call is that
defendant persisted after complainant’s first protest.  Moreover, even
without a protest, the underlying circumstances of physical abuse, threat of
harm and the RFA order put a batterer on notice, as the jury essentially
determined, that  continued, repetitive and unanswered romantic solicitations
would be received as harassment by the victim of his domestic abuse.  





[8]  The instructions also undermine
defendant’s efforts to analogize his case to instances where courts have found
criminal prohibitions on annoying behavior overbroad in violation of the First
Amendment.  See, e.g., People v. Klick,
362 N.E.2d 329, 330-32 (Ill. 1977) (concluding statute, which prohibited making
one annoying phone call, violated First and Fourteenth Amendments because it attempted
to prohibit protected speech).  As previously held, there is “no First
Amendment right to inflict unwanted and harassing contact on another
person.”  State v. Mott, 166 Vt. 188, 194, 692
A.2d 360, 365 (1997).  Unlike Klick,
the condition here in no way proscribed single instances of protected speech,
but, as applied in this particular case, prohibited an intentional and
persistent course of objectively harassing conduct directed towards a
prevailing RFA plaintiff.





[9] 
The statute, 13 V.S.A. § 1062, outlaws stalking, which can consist, in
pertinent part, of harassment defined as “actions directed at a specific
person, or a member of a person’s family, which would cause a reasonable person
to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death,
including but not limited to verbal threats, written, telephonic, or other
electronically communicated threats, vandalism, or physical contact without
consent.”  Id. § 1061(4) (emphasis added).  





[10] 
Robert Mitchum’s portrayal of the smarmy, but
dangerous, Harry Powell in “Night of the Hunter” (Paul Gregory Productions,
1955) is exemplary, with the film adapted from Davis Grubb’s 1953 best-selling
novel by the same name based, in turn, on actual domestic-violence incidents of
gothic proportion.   

 





[11]  Further, and contrary to defendant’s
assertion, the condition was not invalid even if he was not personally aware
his conduct would violate the order.  In a prosecution for violation of an
RFA, the State need “prove only that defendant violated the order after it was
properly served upon him.”  State v. Crown, 169
Vt. 547, 549, 726 A.2d 493, 495 (1999) (mem.). 
The State need not prove defendant subjectively knew his conduct violated the
order.  Id. (declining to hold that a charge of first offense
violation of an RFA under 13 V.S.A. § 1030(a) calls for proof that
defendant understood the requirements of the abuse-prevention order).  





[12] 
If the jury “struggled” with the definition supplied by the court, as argued by
the majority, ante, ¶ 33, its puzzlement was unanimously resolved within
minutes of the court’s reiteration, without elaboration, that the common
definition would govern.